CITY OF ST. LOUIS, Appellant, v. NANCY T. POPE ET AL., Defendants, WARWICK OPERATING COMPANY, a Corporation, et al.—126 S. W. (2d) 1201.

Court en Banc, April 4, 1939.

*E. H. Wayman, Jno. T. Hicks* and *Francis J. Sullivan* for appellant.

*Boudreau & Kramer, Case, Voyles & Stemmler, Clark M. Clifford, M. W. Feuerbacher, Arthur J. Freund, D. Calhoun Jones, Jones, Hocker, Gladney & Grand, Albert F. Muench, Charles A. Neumann, Rassieur, Kammerer & Rassieur, Luther Ely Smith, John C. Tobin* and *Charles P. Williams* for International Building Company et al.

*A. B. Frey* and *Karol A. Korngold* for Johnson et al.

*Marion C. Early, Louis B. Sher, Thomas J. Cole* and *Ford W. Thompson* for Town Club Investment Company et al.

*Jacob M. Lashly* and *Maurice P. Phillips* for Ledlie, Blair and Lashly.

*Taylor, Chasnoff & Willson* for J. C. Penney Building and Realty Corporation et al.

*Frank H. Haskins,* for Warwick Operating Company et al.

*Williams, Nelson & English, Allen May* and *John R. Griffiths* for State Life Insurance Company et al.

*Banister, Leonard & Sibley* for Essex Investment Company.

*Sylvan Agatstein* for Davis et al.

*Stephen Boggiano* for Publicity Building Realty Corporation.

*George B. Whissell* and *William E. Johnson* for Southwestern Bell Telephone Company; *Earl H. Painter* and *John B. Mohler* of counsel.

*W. J. Blesse* and *William Kohn* for United States Building Corporation.

*Thompson, Mitchell, Thompson & Young* and *C. P. Berry* for Mercantile Trust Company et al.

*Henry T. Ferriss* for Hotel Jefferson Company.

482

*Lewis, Rice, Tucker, Allen & Chubb* for May Department Stores et al.

*W. Scott Hancock* for trustees under last will and testament of Horatio Nelson Spencer.

*Stamm, Stewart & Pflager* for National Lead Company et al.

LUCAS, J.—This is a condemnation proceeding by the City of St. Louis under its Charter to condemn property for the "Memorial Plaza." The question for decision on this appeal may be briefly stated as follows:

Is the City authorized and empowered by its Charter, in this particular proceeding, to establish a taxing district or benefit district for the purpose of collecting special benefits from the properties within the taxing district, pursuant to Section 4 of Article XXI of its Charter, or is it a proceeding that comes under the provisions of Section 12 of said Article XXI requiring the City to pay all the damages?

The facts as disclosed by the record are exceedingly voluminous, but for the purpose of this appeal we think the important facts may be stated as follows:

Some time prior to the year 1923, civic-minded citizens of St. Louis inaugurated a movement for municipal improvements and beautification of the City and advocated a city-wide bond issue as the means of financing these municipal improvements. It is conceded that St. Louis at that time needed numerous improvements due to the fact that it had become one of the exceedingly large cities of the country and the civic improvement and beautification of the City had been sadly neglected; for instance, the old Court House had become inadequate; the City was in need of a Municipal Auditorium as it had no place to entertain large gatherings; there were numerous other outstanding needs.

The people formed an organization known as the "General Council on Civic Needs" which council consisted of one hundred and eighty-four representative and outstanding organizations of the City of St. Louis, and these organizations represented practically the whole citizenry of the City. This organization meant to improve and beautify the City. The people became so interested that the City enacted Ordinance No. 32,019 which ordinance called for a special city election to be held February 9, 1923, at which election there was submitted to the qualified voters of the City, twenty-one propositions for the people to vote upon and thereby determine whether the City should issue bonds of the City in the various amounts, and for the specific purposes stated in said ordinance. The propositions were:

1. Establishing, opening and widening streets, $8,650,000.

2. A public plaza opposite the union station, $2,600,000.

3. Paving, re-paving and otherwise improving streets and highways, $5,800,000.

4. Purchase and installation of electric street lighting system, $8,000,000.

5. Acquisition of site and erection of court house, $4,000,000.

6. Construction and reconstruction of public sewers and acquisition of rights-of-way, $8,000,000.

7. Improvement of River des Peres, etc., $11,000,000.

8. Acquisition of land for additional public parks, squares, playgrounds, recreation fields, swimming pools and equipment therefor, $2,500,000.

9. Construction of buildings in, and improvements of, parks, squares, etc., $1,300,000.

10. Construction of aquarium in Forest Park, $400,000.

11. Plant to heat, light and furnish power to municipal buildings, etc., $1,000,000.

12. Acquisition of land and construction of, and equipment of, hospitals, etc., $4,500,000.

13. For the acquisition of a site and the erection of a civic building to be known as the "Municipal Auditorium and Community Center Building," to be used for the holding of public meetings, gatherings, and conventions, for the discussion of public questions, including matters submitted to the people under the referendum or the initiative, and to provide suitable meeting places for educational, moral, musical, industrial, labor and other purposes, $5,000,000.

14. For the acquisition of land adjacent to and in the neighborhood of the City Hall, in some or all of the following City Blocks, namely—(land as designated) for a public plaza to be known as "Memorial Plaza," and for the erection therein of a memorial building or monument in appreciation of the services rendered by the Citizen Soldiers of Missouri in the late World War, and for the purpose of preserving the records and perpetuating the memory of their heroic achievements and sacrifices, $6,000,000.

15. Acquisition of sites and construction of fire engine houses, etc., $772,500.

16. City's share of the cost of elimination of railroad grade crossings, $1,600,000.

17. Land and construction of west end approach of Municipal Bridge, $1,500,000.

18. Land and erection of east end approach of Municipal Bridge, $1,500,000.

19. Armory, $1,000,000.

20. Public Markets, $1,250,000.

21. Improvement and construction of new waterworks plant, $12,000,000.

The total amount of bonds submitted at this election was approximately $88,000,000. All propositions carried except No. 19, which was a million dollars for an Armory. The propositions were submitted separately so that the voters could vote for or against any one or more of the propositions. Section 5 of the ordinance provided that the proceeds of the sale, or sales, of any of the bonds aforesaid which may be issued upon the authority of an affirmative vote, as above stated, for any one of the specific purposes designated in this section . . . shall be used for such purposes only, namely:

"Proposition Thirteen: For the acquisition of a site and the erection thereon of a civic building to be known as the 'Municipal Auditorium and Community Center Building,' to be used for the holding of public meetings, gatherings and conventions, for the discussion of public questions, including matters submitted to the people under the referendum or the initiative, and to provide suitable meeting places for educational, moral, musical, industrial, labor and other purposes, $5,000,000."

"Proposition Fourteen: For the acquisition of land adjacent to and in the neighborhood of the City Hall, in some or all of the following City Blocks, namely City Blocks numbered 489, 490, 491, 492, 499, 500, 501, 505, 209 East and 209 West, for a public plaza to be known as 'Memorial Plaza' and for the erection therein of a memorial building or monument in appreciation of the services rendered by the Citizen Soldiers of Missouri in the late World War, and for the purpose of preserving the records and perpetuating the memory of their heroic achievements and sacrifices, $6,000,000."

The City, by Ordinance No. 32,343, properly declared that twenty of the twenty-one propositions had received the necessary two-thirds vote and that $87,372,500 of municipal bonds had been authorized.

Prior to the election the "General Council of Civic Needs," which organization cooperated with the then city officials in advocating the benefits and need of the general bond issue, circulated generally and widely among the voters a pamphlet directed to the voters and which pamphlet contained several pages of information about the proposed improvements and how the money was to be supervised and expended. This pamphlet stated that the funds from the bond issue would be expended under the supervision of a "Citizens' Bond Supervisory Committee;" that the improvements are absolutely necessary for St. Louis to maintain its prominence among the great cities; that the public improvement program was not for the special benefit of any man, business or interest, but that everybody would receive benefits from these public improvements; that Mayor Kiel had already appointed a committee of representative men of business,

civic and labor organizations to supervise the handling of the money; that by issuing bonds the cost of the improvements is spread over a period of years so that not only the taxpayers of the present but the taxpayers of the future will enjoy and derive a benefit from the improvements and will pay a proportionate share of the costs.

The City, by Ordinance No. 32,496, authorized and directed the issuing of the bonds, and said ordinance provided that bonds in the sum of $6,000,000 should be issued and the proceeds from their sale should be used for the purposes in Proposition Fourteen of Ordinance No. 32,019, which was the ordinance calling the election. The entire $6,000,000 of ''Memorial Plaza'' bonds were sold.

The City, by Ordinance No. 33,252, effective August 8, 1924, provided as follows:

''An ordinance establishing a public plaza to be known as 'Memorial Plaza' in City Blocks 489, 490, 491, 492, 499, 500, 501, 505, 209 East and 209 West, directing the institution of condemnation proceedings for the acquisition of property for the establishment of said plaza and providing for the vacation and abolishment of Thirteenth Street from Chestnut Street to Market Street, Johnson Street southwardly from Market Street and of the alleys in the said blocks for the same purpose.

''Be it ordained by the City of St. Louis, as follows:

''Section One. There is hereby established a public plaza, to be known as 'Memorial Plaza,' as contemplated in proposition fourteen or ordinance numbered thirty-two thousand nineteen, approved November eighteen, nineteen hundred twenty-two, which shall include the land and property described as follows:

''That portion of City Block 489, together with the alley in said block, bounded on the north by the south line of Chestnut Street, on the east by the east line of the north and south alley in said block and distant about one hundred twenty feet eastwardly from Twelfth Street, on the south by the north line of Market Street and on the west by the east line of Twelfth Street.

''All of City Block 490, together with the alleys in said block, bounded on the north by the south line of Chestnut Street, on the east by the west line of Twelfth Street, on the south by the north line of Market Street and on the west by the east line of Thirteenth Street.

''All of City Block 491, together with the alley in said block, bounded on the north by the south line of Chestnut Street, on the east by the west line of Thirteenth Street, on the south by the north line of Market Street and on the west by the east line of Fourteenth Street.

''That portion of Thirteenth Street from the south line of Chestnut Street to the north line of Market Street.

''All of City Block 492, together with the alley in said block, bounded on the north by the south line of Chestnut Street, on the east by

the west line of Fourteenth Street, on the south by the north line of Market Street and on the west by the east line of Fifteenth Street.

"All of City Block 499, together with the alley in said block, bounded on the north by the south line of Pine Street, on the east by the west line of Fourteenth Street, on the south by the north line of Chestnut Street and on the west by the east line of Fifteenth Street.

"All of City Block 500, together with the alley in said block, bounded on the north by the south line of Pine Street, on the east by the west line of Thirteenth Street, on the south by the north line of Chestnut Street and on the west by the east line of Fourteenth Street.

"All of City Block 501, together with the alleys in said block, bounded on the north by the south line of Pine Street, on the east by the west line of Twelfth Street, on the south by the north line of Chestnut Street and on the west by the east line of Thirteenth Street.

"All of City Block 505, together with the alley in said block, bounded on the north by the south line of Olive Street, on the east by the west line of Thirteenth Street, on the south by the north line of Pine Street and on the west by the east line of Fourteenth Street.

"All that portion of City Block 209 east, bounded on the north by the south line of Market Street, on the east by the west line of Fourteenth Street, on the west by the east line of Johnson Street, and on the south by a line parallel to the north line of Clark Avenue and distant 175 feet northwardly therefrom, measured along the west line of Fourteenth Street.

"All that portion of City Block 209 west, bounded on the north by the south line of Market Street, on the east by the west line of Johnson Street, on the west by the east line of Fourteenth Street and on the south by a line parallel to Clark Avenue and perpendicularly distant 184 feet northwardly therefrom.

"Section Two. The City Counselor is hereby directed to institute condemnation proceedings pursuant to the Charter of the City of St. Louis for the acquisition of property for the establishment of a public plaza as herein provided.

"Section Three. Thirteenth Street from the south line of Chestnut Street to the north line of Market Street, that portion of Johnson Street extending from the south line of Market Street southwardly to a line parallel to the north line of Clark Avenue and perpendicularly distant 184 feet northwardly therefrom and the alleys in City Blocks 489, 490, 491, 492, 499, 500, 501, 505 are hereby vacated and abolished to become part of the Plaza hereby established.

"Approved July 9th, 1924."

Pursuant to the above ordinance the City Counselor on January 24, 1925, filed a petition seeking to condemn the "Memorial Plaza" site and requesting the appointment of commissioners to assess dam-

ages and benefits, and thereafter on September 20, 1926, an amended petition was filed in said cause. Said petition is the usual and ordinary petition in condemnation proceedings and fully described the property sought to be taken or damaged and said petition set out in full Ordinance No. 33,252 and which petition in its prayer reads as follows:

". . . that at such hearing the Court will appoint three disinterested persons, freeholders of property in the said City of St. Louis, and residents of said City for five years next before the date of such appointment, as commissioners to ascertain, determine, assess and award the value of the property proposed to be taken, and other damages which the respective owners of, or persons claiming an interest in and to, the several lots or parcels of land included in the premises hereinbefore described, may severally sustain by reason of the appropriation, condemnation, taking or damaging by the City of St. Louis of their respective interests in and to the said premises, for such use thereof as a public plaza; and, also, for the payment of such values and damages, to assess against all lots or parcels of property, or interests therein, which shall be especially benefited by the establishment of the 'Memorial Plaza' as a public plaza as set out in said Ordinance No. 33,252, separately, and in the names of the several owners thereof, to the amount that each such lot or parcel of property or interest therein so assessed, shall be respectively especially benefited by the establishment of the 'Memorial Plaza' as thus ordained, and to assess the balance of said values and damages, over and above the amount of said special benefits assessed, against the City of St. Louis; that plaintiff may have judgment for the condemnation of the property hereinbefore described for the uses contemplated by said ordinance, and that upon the payment or tender by the City of St. Louis of the values and damages, less the respective benefits, which may in each instance be so assessed as aforesaid, the title to and possession of said property shall be vested in the City of St. Louis, and it shall have and hold the same for the purposes of and uses as a public plaza as provided by said ordinance; and that plaintiff may have judgment against the several lots or parcels of property or interests therein for the respective assessments of special benefits, in excess of the values and damages in each instance, as assessed in the premises by said commissioners; and that the Court may make such other and further orders in the premises as right and justice may require."

Three commissioners were duly appointed and gave public notice as required by the Charter to the effect that they would meet March 16, 1927, for the purpose of ascertaining and assessing the values of and the damages and benefits to private property with respect to said improvements; and which notice recited the establishment of the benefit or taxing district and gave boundaries thereof which

boundaries were the Mississippi River on the east, Ewing Avenue (29th Street) on the west, Cass Avenue on the north and Chouteau Avenue on the south.

Said commissioners filed their report on June 27, 1928, and in said report did not assess benefits against all of the property within the established benefit district but only upon property within a portion of the established district. Total damages were assessed in the sum of $6,677,088.75. Special benefits were assessed in the sum of $1,690,-615.50 and the balance in the sum of $4,986,473.25 was assessed against the City. The special benefits were assessed against some thirteen or fourteen hundred pieces of property. The report, of course, described the property to be taken as the site for the "Memorial Plaza." Numerous items of property necessary for the site of the "Memorial Plaza" were acquired by deed after the price to be paid therefor by the City had been agreed upon between the City and the owners and the report of the commissioners contained these values on these particular items as were agreed upon.

Notice of the filing of the commissioners' report was duly given and within the time permitted by the Charter 198 exceptions were filed. Trials and hearings were had upon numerous of the exceptions filed by respondents. Thereafter, on December 7, 1931, the circuit court entered a so-called final judgment and the City appealed from that judgment but this court in the case of City of St. Louis v. Pope et al., 68 S. W. (2d) 805, held that the judgment was premature and that the judgment was not a final judgment. Thereafter, on December 9, 1935, the circuit court set aside the alleged judgment of December 7, 1931, in accordance with the mandate of this court.

Thereafter, on January 17, 1936, the circuit court duly rendered and entered of record its final judgment in the case which judgment properly condemned the property as prayed for in the petition and fixed the damages caused by reason of the establishment of said "Memorial Plaza" in the sum of $6,685,697.75 and entered judgment in favor of each of the defendants for the respective amount of damages set out in the commissioners' report or as modified by stipulation or by the court. The judgment further recites that the commissioners fixed a benefit or taxing district and gave due notice thereof, and that the commissioners made certain special benefit assessments against certain parcels of property within the benefit or taxing district as set out in the commissioners' report. The judgment further recites that the court had sustained exceptions to various numbered items of benefits which exceptions had been filed by some property-owners to the items enumerated in the judgment. The judgment further recites that certain exceptions filed by the City to items enumerated in the judgment had been overruled. The judgment recites that exceptions were timely filed by defendants to various items as set out in said judgment.

The judgment concludes as follows:

"The Court finds that at the trial of the above exceptions, which exceptions were filed within the time prescribed by the Charter of the City of St. Louis to the commissioners' report, being items of assessment of special benefits in the benefit district set out by the said commissioners in said report, that as a matter of fact the commissioners in making and assessing benefits herein did not assess benefits for present, actual and instant benefits, but are speculative, conjectural, inequitable, unfair, unjust and grossly excessive, and are not assessed according to correct principles of law. The Court further finds that as a matter of fact these items were not benefited by the contemplated project. The Court further finds that the within proceeding for the condemnation of land for the "Memorial Plaza" was instituted *by authority of ordinance 32,019 and proposition 14 thereof*. The Court further finds that the contemplated project falls within *Section 12, Article XXI*, of the Charter of the City of St. Louis. The Court further finds that the commissioners appointed. herein *were without authority* to set out or fix a benefit district and to assess benefits therein. (Italics ours.)

"It is, therefore, ordered, considered and adjudged by the Court that, by reason thereof, the above exceptions filed to the commissioners' report on behalf of the defendants are sustained.

"The Court further finds that within the time provided by Section 7, Article XXI of the Charter of the City of St. Louis, plaintiff filed exceptions to items 168, 217, 231, 237, 239, 240, 264, 660, 661, 662, 663, 664, 665, 666, 667, 668, 669, 670, 671, 672, 777, 781, and 1174 of the commissioners' report. Plaintiff's exceptions as to such items are overruled.

"The Court finds that the commissioners duly appointed in the within proceedings made certain other special benefit assessments against certain parcels of property within the benefit or taxing district as set out by said commissioners, to which exceptions were not filed within the time provided by Section 7, Article XXI of the Charter of the City of St. Louis.

"Therefore, it is further ordered, considered, and adjudged by the Court that such items of the commissioners' report, viz.: (Here follows numbers of items as contained in the commissioners' report to which items exceptions were not filed within the time provided by Section 7, Article XXI of the Charter) are stricken from the commissioners' report, dismissed, set aside, vacated and held for naught.

"It is further considered, ordered and adjudged that the plaintiff pay the costs of this proceeding.

"It is further ordered that the clerk of this court certify to the Comptroller of the City of St. Louis a copy of this judgment."

The City filed its motion for new trial which was overruled February 3, 1936, and this appeal followed.

The record discloses that at the hearings of exceptions filed by property-owners within the benefit district, evidence was offered tending to show that the property was not benefited by the "Memorial Plaza." There was also testimony to the effect that the "Memorial Plaza" is a general improvement and not a local improvement and that the benefits are to the City at large and not to any property in particular. There was evidence to the contrary.

The entire proceeding is controlled by Article XXI of the Charter of the City of St. Louis adopted in 1914. Article XXI is the condemnation article of this Charter. Section 1 thereof provides for the procedure, purposes, ordinances, easement and improvement. No question is presented in this case about the authority of the City to condemn property for the "Memorial Plaza." Section 4 of said Article reads as follows:

"It shall be the duty of the commissioners, except as herein otherwise provided, in the condemnation or the damaging of property for highways, streets, boulevards, parkways, alleys, wharves, sewers, markets, public squares, and parks, or widening or enlaging the same, or in the changing of grade of streets or other public ways or the making of other public works or improvements, to ascertain the value of the property proposed to be taken and the actual damage done to private property, but no allowance shall be made for improvements begun on property after service of summons on or notice by publication to the owner thereof as herein provided; and the public work, improvement, or use contemplated shall not be considered in determining the value of the property taken. For the payment of all such damages the commissioners shall assess against all the lots or parcels of property or interests therein especially benefited by the proposed public work or improvement, separately, and in the name of the several owners thereof, the amount that each such lot or parcel of property or interest therein so assessed shall be especially benefited by the proposed public work or improvement, and against the city the balance of the damages over and above the aforesaid special benefits assessed; provided, that in the opening of an alley there shall be assessed against the lots or parcels in the blocks in which the alley is opened benefits sufficient to pay all damages."

Section 5 is as follows:

"The commissioners shall view the property to be taken, damaged, or assessed; fix the benefit or taxing district; publish in said newspaper for ten days before beginning their assessment a notice of the boundaries of the benefit or taxing district and of the time and place at which they will assess such damages and benefits; hear the evidence submitted by the parties interested; assess the damages and benefits as of the date said ordinance became effective; and make report, in which at least two commissioners shall concur, of such assess-

ment in writing and under oath to the circuit court. In such report the compensation allowed to and the benefits assessed against each owner shall be separately stated. When the commissioners both assess benefits and allow damages against any one property-owner they shall deduct the lesser from the greater."

Section 12 reads as follows:

"When the City takes or damages private property for a public use other than those enumerated in Section 4 of this article all damages shall be ascertained as hereinbefore provided and shall be paid by the City."

The Court found that the condemnation suit for the site of the "Memorial Plaza" fell under Section 12 of Article XXI of the Charter and that therefore the damages as determined by the commissioners shall be paid by the City. The City contends that the condemnation proceedings for the site of the "Memorial Plaza" falls under Section 4 of Article XXI and that a benefit district could be properly created and benefits assessed. If the City is correct in its contention, then the benefit district was properly created, and the validity of the various items of benefits assessed within the benefit district would have to be determined separately and as provided for in the Charter. However, if the contention of the City cannot be upheld then the judgment of the trial court must be sustained.

The controversial points necessary for decision in order to determine the correctness or incorrectness of the City's position are as follows:

1. Is the "Memorial Plaza" like, or so similar to, a *park* or a *square* as to require this condemnation proceeding to come within the limits of Section 4 of Article XXI of the Charter? Or is the "Memorial Plaza" so different and distinct from a *park* or *square* as to prohibit this proceeding from falling within said Section 4 and thereby coming under Section 12?

2. Is "Memorial Plaza" such an improvement or addition to the City which confers general benefits upon the entire City, or is it such an improvement or addition to the City which might be termed a local improvement thereby conferring special benefits upon a certain portion of the City?

A record of 2700 pages and thirty-four briefs citing more than 200 cases make it impossible for us to consider and distinguish, in a written opinion, the holdings of the various cited authorities. Appellant makes twenty-eight assignments of error; because of our views of this case it will only be necessary to discuss the assignments pertaining to the above mentioned controversial matters.

I. We cannot read into Section 4 of Article XXI improvements that are not specifically mentioned therein. The people in adopting the

Charter in 1914 enacted Section 12 of said Article XXI and therefore, the people by thus enacting said Section 12 understood that there would be public improvements other than those mentioned in Section 4 of said Article.

The first ordinance pertaining to the "Memorial Plaza" became effective in November, 1922. Therefore, we must look to the history of the project and to the language of the ordinance in order to determine which section of the Article controls this proceeding. Ordinance No. 32,019 was the first legislative act of the City pertaining to this project. This ordinance authorized and directed the holding of a special election at which the voters were asked to vote upon the question of authorizing bonds to be issued for the twenty-one propositions above enumerated, and Section 1 of said ordinance concludes with this language: "In the amounts and for the specific purposes stated in said propositions."

Section 4 of said ordinance specifically describes the twenty-one propositions there submitted and specifically fixes the amount of bonds authorized to be issued for each specific purpose contained in each proposition. As hereinabove set out these twenty-one propositions covered improvements to be made in various parts of the City and the particular propositions for our consideration are propositions 13 and 14 which are set out in full above. The ordinance by Section 1 specifically stated that the amounts of bonds voted should be specifically used for the purposes stated in each proposition.

After the enactment of said Ordinance No. 32,019, there was circulated generally and widely among the voters of the City a pamphlet which was introduced as evidence in this case as "Exhibit Z" in the trial of the exception of the Missouri Pacific Railroad Company. This pamphlet was signed by 184 organizations of the City of St. Louis which organizations represented every phase of the citizenship of the City. This pamphlet was also signed by the "Citizens' Bond Supervisory Committee" which committee consisted of sixteen prominent citizens appointed by the Mayor and this pamphlet described and explained the proposed bond issue as stated heretofore in this opinion. Appellant objected to the introduction in evidence of this exhibit "on the ground that on its face it cannot in any way bind the City of St. Louis. It was not published by the City of St. Louis." The trial court, in passing upon this objection, ruled—"I will overrule the objection. I think it is admissible on this theory; there is some ambiguity about the ordinance as to whether or not it was instituted under one section of the Charter or another. We are trying to arrive at the intent of the legislative body of the City to find out their intent, and in order to do that we have a right to search the surrounding circumstances. . . . It is a document used in connection with the bond issue to the voters to get the background,

and the historical background in back of the bond issue. . . . . I will let it in." This pamphlet as "Exhibit Z" was properly received in evidence as an aid to the court in understanding the history of this proceeding and the subsequent actions of the Board of Aldermen. The circulation of this pamphlet and the information therein forms a part of the public history of the bond issue election which was an important local event. Matters of public history and of common knowledge pertaining to the interest of the voters in, their attendance upon, elections in important cities may even be a matter of judicial knowledge. Courts are not presumed to be ignorant of matters about which the general public knows. [23 C. J., sec. 2001, p. 170; sec. 1963, p. 140; sec. 1933, p. 122; sec. 1884, p. 93, sec. 1925, pp. 116-7; sec. 1810, pp. 59-61; State ex rel. v. McQuillin, 246 Mo. 517, 152 S. W. 347; Childress v. Southwest Missouri Railroad Co., 141 Mo. App. 667, 126 S. W. 169; State ex rel. Pollock v. Becker, 289 Mo. 660, 233 S. W. 641.]

After the people had authorized this public indebtedness the next act of the Board of Aldermen was to pass Ordinance No. 32,496 which ordinance directed the issuance of the bonds and provided for an annual tax sufficient to meet the accruing interest and maturing principal. Said ordinance provided that $6,000,000 worth of bonds should be issued and sold and the proceeds from their sale should be used for the specific purposes provided for in proposition 14 of Ordinance No. 32,019 which was the "Memorial Plaza" proposition as hereinbefore set out.

Section 1 of Ordinance No. 33,252 established this public plaza as "Memorial Plaza" as contemplated in proposition 14 of Ordinance No. 32,019. This ordinance merely directed the City Counselor to institute condemnation proceedings pursuant to the Charter for the acquisition of property for the establishment of a public plaza as herein provided. If no special benefits are conferred by a proposed improvement, then a benefit district could not be properly created and the commissioners would have to assess all of the damages against the City.

The intention of the City is further clarified when we consider that the City in this condemnation proceeding described land that was not to be used for the site of the "Memorial Plaza." For instance, City Blocks 209 East and 209 West were condemned in this suit and benefits assessed to help pay for same, yet, the Municipal Auditorium was erected upon this site and it was never used as a part of the *Plaza*. Again, the front entrance and steps to the Civil Courts Building were to be located on, and were thereafter built, on lands condemned in this suit. This shows that the City in its condemnation proceeding did not limit the site to be acquired to the site of the "Memorial Plaza." Certainly no one would contend that the entrance steps to

the courthouse or the Municipal Auditorium are improvements conferring special benefits upon surrounding and adjacent property sufficient to justify levying of special assessments.

While it has been held that small portions of the condemned property may be used for other purposes than the subject of the suit, yet, when interpreting the intention and meaning of a legislative body it is lawful to consider the acts of the body in the handling of the property at the time or before the suit was filed.

In the Senter Commission Company case, 337 Mo. 238, 85 S. W. (2d) 21, this court laid down this rule: "The primary rule of construction of statutes or ordinances is to ascertain and give effect to the lawmakers' intent . . . this should be done from the words used, if possible, considering the language honestly and fairly to ascertain its plain and rational meaning and to promote its object and manifest purpose." As stated herein all doubts must be resolved in favor of the taxpayer. A liberal construction as supported by such cases as St. Louis v. Liessing, 190 Mo. 464, 89 S. W. 611, and Smith v. City of New Albany, 175 Ind. 279, 93 N. E. 73, is not applicable when the taxing power of the City is sought to be exercised.

We think that it is clear from the ordinances themselves that the Board of Aldermen never at any time contemplated the creation of a "park" when they used the term "plaza."

Sections 4 and 12 of Article XXI of the Charter are quoted above; Section 4 does not mention *plaza*. Therefore, unless *park* or *square* as used in Section 4 can be held to include *plaza*, then Section 12 must control this proceeding. In numerous cases such as Church v. City of Portland, 18 Ore. 73, Nicholas et al. v. Jose et al., 6 Philippines, 589, Harty v. Municipality of Victoria, 13 Philippines, 152, People v. Padilla, 20 Porto Rico Reports, 262, the word *plaza* has been interchanged with *park* or *square*. Most of these and similar cases are from jurisdictions where Spanish influence has dominated, but the original Spanish meaning of the word *plaza* has been lost in these new countries and the word *plaza* has acquired an interchanged or broader meaning than it had in Spain or Italy from whence came the original word. Spanish dominance or influence has never prevailed in St. Louis although early St. Louis history discloses two short periods of Spanish control. On the other hand French and German people have left a more lasting influence upon this City.

In 1922 when the people of St. Louis started the movement to improve and beautify the City, they soon exhibited a very definite and determined desire to accomplish results of magnitude and beauty. Then the City administration selected a committee to plan these improvements and to supervise the spending of the bond issue money. In planning the "Memorial Plaza" and the monument to the soldier dead to be erected therein, experienced and trained engineers and

architects, such as Harland Bartholomew and Louis LaBeaume, were selected to design the project and direct the construction thereof. These experts were of international reputation and they set out to plan and accomplish for the people and the City the very things that were desired by the people and the City. The people had voted bonds to pay for a "Memorial Plaza." The City by its Board of Aldermen had passed ordinances calling for a "Memorial Plaza." These highly trained experts in the architectural and construction field of art and beauty evidently interpreted the word "plaza" to mean what other artistic-minded designers and planners meant when using this word. It is more reasonable to believe that they meant something different from a park or square. They actually designed something different from a park or square as known to St. Louis or any other Missouri city. Therefore, the legislative branch of the City Government is presumed to have understood the meaning of the word *plaza*.

Certainly all parks are not *plazas*, then are all *plazas* parks? No one of sufficient ability to lay out or plan a park or plaza would for an instant contend that Forest Park in St. Louis or Swope Park in Kansas City are *plazas*. On the other hand these same people would not assert that Memorial Plaza opposite the Union Station in Kansas City or that the entrance to the State Capitol Building in Jefferson City are parks.

The question then arises,—what is a *plaza*? In the recent case of City of St. Louis v. Senter Commission Company this court in speaking of the word *plaza* quoted from Webster's Dictionary and from some cases in the western hemisphere, but the definition of the word *plaza* was not material to the decision in that case. Therefore, we do not feel that we are interfering with the decision of that case when we define the word *plaza* in this case. To define the word *plaza* as was used in the construction of "Memorial Plaza" we need to give the word more consideration than has heretofore been given to it by this court.

"Memorial Plaza" as defined by the ordinances of the City of St. Louis is fully set out in proposition 14 of Ordinance No. 32,019, as quoted above and concludes as follows:

"For the erection therein of a memorial building or monument in appreciation of the service rendered by the citizen soldiers of Missouri in the late World War and for the purpose of preserving the records and perpetuating the memory of their heroic achievements and sacrifices."

Around this soldiers' memorial was to be a space or opening and it was to be beautiful. The location was to be near the center of the business district of this great City. Such a place and structure does not seem to fit the definition of *plaza* as contained in Webster's Dictionary and this court in Albers v. City of St. Louis, 268 Mo. 349, 1.

c. 358-9, 188 S. W. 83, has held that the dictionary definition of a word is not always controlling when the word is used by governmental agencies. As hereinbefore stated we think that the legislative branch of the City Government in using the word *plaza* meant to use the word with its true meaning and significance and did not intend to use the enlarged or broadened meaning of the word *plaza* as has been done in such states as California and Texas and in Porto Rico, the Philippines and other western countries where the word *plaza* has been modified and has lost a part of its original Latin or Spanish meaning.

The word *plaza* is derived from the Latin word *platea*. Therefore, the word *plaza* has a true Spanish meaning. The Royal Academy of Spain is the official academy of that country for the final definition of what any word in that language connotes. This academy gives the word *plaza* many meanings but at no time states it is the equivalent to square. Quoting from this authority we find the following:

"*Plaza*—(From Latin *platea*) f. A broad and spacious site within a town. That special spot where food is sold, where the neighbors, gather, and where fairs, sales, trades and public festivals take place.

"*Send to the plaza the best servant in the house.* A proverb which means that for purposes of public business one should make use of the most reliable and apt servant.

"*To make plaza.* fr. Speaking of certain things, to sell them at retail publicly.

"Plaza! The cry or call used when the king went forth, or on other occasions when there was a great crowd, to order the people to clear the way or to make room.

"*Quien*, etc. A proverb meaning that he who does anything in the civic center (to-wit, publicly) is liable to be censured by many.

"*Sacar a la plaza, o a plaza*, a figurative and familiar term meaning to publish, to render public. . . ."

These excerpts show the term *plaza* to be synonomous with the center of political, civil and commercial activity of the metropolis. Again in "Espasa-Calpe" we find this definition:

"A broad and spacious place in a town."

In Spain the bull-fights were formerly held in the public *plaza* which was in the nature of an amphitheater.

In official Spanish sources a *plaza*, regardless of its size, was the place of chief importance, center, or the hub of public life and commercial enterprise. Here the great events of the cities' life took place. The King spoke in the plaza and the word *plaza* was associated with the word grandeur. The *plazas* of Spain were and are places of beauty on which public buildings were not placed but it was the place around which and toward which were faced important buildings of the City. For instance:

"*Plaza Puerta del Sol.—It is surrounded by beautiful Buildings,*

*but none of them has a monumental type or aspect.* These buildings comprise the most important hotels, and on their main floors are the most elegant stores and the most frequented restaurants. *The Puerta del Sol is the heart of the city; it is there that all its arteries meet.''*

*L'Espagne et Le Portugal, Guides Diamant*—par. A. Germond de Levigne de l'Academie Espagnole. Libraries L. Hachette et Cie. Paris, 1867.—p. 32.

*"Chapter VI, page 79. Introduction to the Capital. Plaza Puerta del Sol.*—We are in the center of everything on the Puerta del Sol, on which fronts the Hotel de la Paiz. This is *the heart* of Madrid, the *central point* of the spider's web, from which radiate all the principal streets and the tramways. *The Puerta del Sol is not only* the geographical center of the City, but the center of its life, the place where its heart beats, into which all streams pour and from which they flow.''

*Old Spain and New Spain,* by Henry M. Field, DD., Fifth Edition, New York, Charles Scribner's Sons, 1896.

''Our detour leads us into the historic arcaded Plaza Mayor (called also Plaza de la Constitucion), surrounded by dignified five-story buildings through which arches have been cut to permit the passage of trolley cars.

''In this Plaza, in olden days, tournaments, bull fights and horse races were held. Here saints were canonized. Where the splendid equestrian statue of Philip III stands, surrounded by flower beds in the centre of the square, autos-de-fe were once held, while royalty and nobility looked down from the windows of the surrounding buildings.

''As night falls this is a romantic place. Let us eliminate the 'unfashionables' sipping their mild apertifs in the sidewalk cafes and substitute for paved streets, tramlines and electric lights, cobblestones and oxcarts, pine flares and tallow candles, and we have *the city's market place of centuries ago.''*

The National Geographic Magazine. July-December, 1931, Vol. LX, page 238.

*"Plaza de Oriente.* This semicircular plaza is surrounded by a promenade. among the trees of which are to be seen from time to time forty-four colossal stone statutes. *In the center there is a square,* of oval shape, a little higher than the ground and surrounded by a railing. In the center of this square, on a base of granite, there rises an equestrian statue of Philip IV, designed after a painting by Valazquez.''

*L'Espagne et Le Portugal, Guides Diamant,* par. A. Germond de Lavigne de l'Academie Espagnole, p. 32.

The word *plaza* in the Spanish meant a pretentious open space of considerable importance, activity and grandeur faced by the most important public and commercial edifices—the center of civic activities.

St. Louis, in establishing its ''Memoral Plaza,'' selected as its site

a place opposite its most important public buildings, a place near some of the largest and most beautiful business buildings of the City. All of this was in keeping with the true meaning of the word *plaza*. The City Hall, the Civil Courts Building, the grand Municipal Auditorium, the New Federal Building, all face the "Memorial Plaza." It is a place where the records of Missouri's heroes may be safely deposited and preserved. It is a place where the President of the United States, or any other prominent person, may speak to 100,000 listeners. It is not a place where people will go, as to a park for a day's outing, but it is a place where people will gather on patriotic, festive or momentous occasions to be informed or to listen to programs or other entertainment. It is not a park. It is not a square. Squares in cities are open spaces created fundamentally for the purpose of ventilation. [Baird et al. v. Rice et al., 63 Pa. St. 489.] The "Memorial Plaza" was not planned or constructed for that purpose.

That the City of St. Louis meant to memorialize its soldier dead by a space and building of beauty and grandeur is signified by the conduct and action of the City and the people from the inception of the thought of a "Memorial Plaza." The first ordinance (No. 32,019) that was passed so stated. The ordinance creating it (No. 33,252) so stated. What other intention could be drawn from these acts? Even the City by its brief and argument reflects this intention because the arguments therein assert that the construction of the Auditorium and the construction of the front entrance and steps of the court house on the approved site condemned for the *plaza* does not divert this site from that of a *plaza*. This is certainly true because it is a *plaza* and not a park or square. You would not erect a court house or a post office in a public park but such buildings may be erected along a *plaza* and have their entrance into the *plaza* because a *plaza* connotes the presence of public buildings about it. [Chicago v. Ward, 169 Ill. 392, 48 N. E. 927; Parsons v. Van Wyck, etc., 56 App. Div. 329, 67 N. Y. Supp. 1054; Slavich v. Hamilton, etc., 201 Cal. 299, 257 Pac. 60; Spires v. City of Los Angeles, 150 Cal. 64, 87 Pac. 1026; Williams v. Gallatin, 229 N. Y. 248, 128 N. E. 121, 18 A. L. R. 1238, l. c. 1241.]

Again propositions 8 and 9 as submitted to the voters provided for public parks, squares and the construction of buildings and improvements of parks and squares to the extent of $3,800,000. Therefore, the ordinances of the City specifically distinguished the *plaza* from parks and squares. The intention is clearly shown thereby that "Memorial Plaza" was to be something different from a square or a park. When the architects and engineers designed it they did not lay out a park or a square but they laid out a *plaza* as the people and City had directed.

We hold therefore, that the "Memorial Plaza" as established, designed and constructed does not fall within the limits of Section 4

of Article XXI of the Charter but that the condemnation proceedings to acquire this site are controlled by Section 12, Article XXI of the Charter and that the creation of a benefit or taxing district is prohibited and the entire cost of the "Memorial Plaza" and the Soldiers' Memorial thereon erected must be borne by the proceeds from the sale of the bonds authorized or from sources other than special assessments of benefits.

■ II. The City Charter provides for the assessment of benefits to pay for local improvements. Article I, Section 1, paragraph 3 of the Charter reads: "To make special assessments for local improvements." Article XXIV, Section 3, provides for improvement bonds and funds for local improvements. No place is the City by its Charter empowered to levy special assessments for anything other than local improvements. "Nothing is better settled than that special taxation for objects that are general and public is illegal." [State ex rel. v. Leffingwell, 54 Mo. 458, l. c. 473; Waukegan v. De Wolf, 258 Ill. 374, 101 N. E. 532.]

The questions confront us: "What improvements confer general benefits? What improvements confer local benefits? General improvement may confer a special benefit and yet not support a special benefit assessment. On the other hand a local improvement does not confer a general benefit but confers only local benefits and will support the assessment of special benefits. Appellant in its brief at page 134 quotes from McQuillin as follows:

"Under particular laws, whether an improvement is local is said to be ordinarily a question of fact rather than one of law, to be determined from its nature and object. However, precisely speaking, whether a given improvement is local or general is a question of law, but whether the facts in a particular case show the improvement to be local or general is a question of fact determinable from the conditions and circumstances. In other words, it is such character of improvement as the evidence proves it to be. The character of the improvement, its situation, its surrounding conditions, and whether the substantial benefits to be derived therefrom are local or general in their nature, are all to be considered. . . . The fact that an improvement will be of advantage to the City does not change its character as a local improvement, if primarily of material advantage to the adjacent property, and, where the improvement enhances the value of adjacent property as distinguished from benefits diffused by it throughout the municipality, it is a local improvement." This, as we understand it, accurately states the law but it is no help to appellant as will hereinafter appear. We think it may be conceded that any important improvement increases the value of adjacent property to some extent, but that does not justify special benefit as-

sessments. It is only when such benefit assessments are legally provided for that they can be made.

A memorial of any kind is inconsistent with a local improvement. Such monuments are erected out of respect for a life or lives sacrificed for general safety or protection or because of some great accomplishment. A memorial is never erected for the purpose of conferring present special benefits on adjacent property. The purpose of a memorial is to honor something of the past, not to increase values of the present.

Many cities and states have erected memorials and monuments to the soldiers and the sailors who gave their lives in the World War but we are unable to locate any case holding that these memorials and monuments are in the nature of a local improvement and will support the assessment of special benefits. In fact, these memorials are of such a nature that the entire public not only desires and wants to pay for them but the people would resent the imposition of special taxes upon a community or section to pay for a monument erected to the soldier dead of the State or City. [Hill v. Roberts, 142 Tenn. 215, 217 S. W. 826; Hunter v. City of Louisville, 204 Ky. 562, 265 S. W. 277.]

If a public improvement is of such a nature that it cannot enhance the present value of property within the immediate vicinity of the improvement, then it is not a local improvement. Of course special benefits can be levied upon adjacent property when the benefits are actually conferred by the improvement and when the improvement does not benefit the public at large. Appellant cites numerous cases on local improvements and all of the cases are sound but the cases are those principally involving purely local improvements. It is always true that when the city is properly authorized by its organic law it may sell bonds of the city to discharge the city's part of the indebteness created by the local improvement. Many such cases are cited by appellant but are not applicable to the present question because these cases apply to improvements of local nature and importance, and not to improvements that are general or city-wide in their nature.

We hold that "Memorial Plaza" was such an improvement that its benefits were general, and not local, and that the attempt to levy special assessments because of the benefits conferred is beyond the power of the City.

The trial court has before it 198 exceptions to the commissioners' report and it heard testimony on approximately ninety of these exceptions. All of the exceptions were similar in a general nature in that the principal question involved was the authority of the City to create a taxing district because of the establishment of "Memorial Plaza." The trial court found that there were no special benefits conferred upon any of the respondents whose exceptions were heard,

and there was substantial evidence to support this finding of the trial court. Therefore, the trial court in its finding and judgment was not only correct as a matter of law, but it was right as a matter of fact. Since we find that the trial court was correct both in fact and in law and for other reasons hereinabove stated, the judgment of the trial court is in all things affirmed. It is so ordered. All concur.