STATE of Missouri, ex rel. UNION ELECTRIC COMPANY, a Missouri Corporation, Relator, Plaintiff-Respondent,

v.

UNIVERSITY CITY, Nathan B. Kaufman, H. Hadley Grimm, Harold B. Bamburg, Mrs. Zelda Epstein, Carl I. Katzen, Lawrence Lieberman, Mrs. Harriett Woods, Diedrich F. Rixmann, Marvin L. Madeson and Robert Mendelson, Respondents, Defendants-Appellants.

No. 33418.

St. Louis Court of Appeals, Missouri.

Jan. 20, 1970.

John J. Morris, St. Louis, for defendants-appellants.

Kerth, Thies, Schreiber, Hamel & Dee, Clayton, Joseph E. Birk, St. Louis, James E. Mesnier, St. Louis, for plaintiff-respondent.

SMITH, Commissioner.

This is an appeal from a judgment entered in a certiorari proceeding reversing the action of the city council of University City which had denied Union Electric a conditional use permit to erect an electrical substation at a specified site in University City.

Defendants are the City, its mayor and councilmen, members of its plan commission, and two other city officials.[1]

Union Electric filed its application for a conditional use permit in May, 1967, with the zoning administrator of the City. The application requested a permit for the pur-pose of: "Construction, occupancy, use, maintenance, replacement of, and additions to foundations, fencing, and landscaping for a unit of electrical distribution sub-station equipment and associated facilities," at the northwest corner of Waldron Avenue and Olive Boulevard. This area is zoned B–1 which authorizes retail businesses and kindred services. In accord with the ordinances of the City, notice of public hearing before the city plan commission was published, and Union Electric presented its evidence in support of the permit to that body. No members of the public appeared to oppose the permit and no evidence was offered in opposition to granting the permit. A transcript of the proceedings before the plan commission was made by a court reporter and is part of this record. Union Electric offered to have its witnesses sworn but was advised by the commission that such was unnecessary. Reference will be made hereafter to the evidence presented to the plan commission. At the suggestion of the commission, Union Electric made several attempts to acquire an alternate site proposed by the city planning staff but was unable to arrive at satisfactory terms for the purchase. In August, 1967, "Being satisfied that the applicant had made every reasonable effort to acquire the alternate site, the Commission reluctantly * * *" voted 5–0 to grant the permit.

Under the ordinances of the City any recommendation of the plan commission granting or denying conditional use permits must be approved by the city council. On August 14, 1967, the council met in special session at which time the conditional use permit of Union Electric came before it for discussion. The discussion was extensive covering all facets of the proposed substation, and included intensive questioning by council members of the Union Electric representatives and the city supervisor of planning. No verbatim transcript of this meeting was made but the record here contains the lengthy minutes of this meeting

1. Some members of the plan commission and the two other city officials have not appealed.

as well as subsequent ones of the council. No vote was taken at that meeting on the permit, but at the council's suggestion the Union Electric representatives advised they would consult further with the company to determine whether another site might be feasible or whether the company would be willing to condemn the alternate site it had previously been unable to purchase. Further discussion of the permit occurred at meetings of the council on August 21, 1967, September 11, 1967, September 18, 1967, and November 20, 1967. At none of the meetings did any member of the public appear in opposition to the granting of the permit. Reference will be made hereafter to the discussions at these meetings. On November 20, 1967, by a 5–2 vote the council denied the application.

The suit to review the action of the council was filed and submitted to the court on the record of the proceedings before the plan commission and the council, and the applicable ordinances of the city. The court, on October 11, 1968, filed its findings of fact, conclusions of law, and judgment. The conclusions of law reflect that the relief granted Union Electric by the judgment was premised on three grounds, i. e.: (1) the action of the council was beyond its jurisdiction as an attempt to regulate a utility, (2) Union Electric, having been given the power of condemnation, has the right of selectivity of site unless arbitrary or capricious, and that such selectivity exists even if the land acquired was by purchase rather than condemnation, and (3) the action of the council was arbitrary and an abuse of discretion.

If the judgment of the trial court is supportable on any one of these three grounds we must affirm. In reviewing the action of the trial court we make our own determination of facts, particularly here where the evidence before the trial court is entirely documentary and credibility is not involved. Neither the trial court nor this court can substitute its judgment on the evidence for that of the council, but we are required to ascertain whether the council could reasonably have reached its conclusion on consideration of the evidence before it. Our review of the record convinces us that the action of the council in refusing the conditional use permit was arbitrary and capricious, and completely contrary to the evidence before it. In this posture it is unnecessary to determine the correctness of the trial court's first two conclusions of law, and nothing stated herein should be construed as a holding on those grounds.

University City is a constitutional charter city. We take judicial notice of the charter. See Giers Imp. Corp. v. Investment Service, Inc., 361 Mo. 504, 235 S.W.2d 355 [4]. Section 16 of the charter provides, "In the transaction of legislative business the council shall act only by ordinance. * * *" Article VII, §§ 61, 62, and 63 establish the city plan commission, spell out its duties, make it also the zoning commission, and provide that the "recommendations of the plan commission shall not be binding on the council, which may approve or disapprove the commission's findings * * *." The City has, pursuant to legislative authority (§ 89.010 et seq. RSMo 1959, V.A.M.S.), enacted a comprehensive zoning ordinance. In addition to the permitted specified uses within the various districts of the city, the ordinance provides for conditional uses. These are provided for and defined as follows:

"Sec. 34–67. Conditional uses.

"1. Purpose and intent. The formulation and enactment of a comprehensive zoning ordinance is based on the division of the entire city into districts, in each of which are permitted specified uses that are mutually compatible. In addition to such permitted compatible uses, however, it is recognized that there are other uses which it may be necessary or desirable to allow in a given district in the interest of public convenience, but which may have an effect upon neighborhood uses or public facilities and therefore need to be carefully regulated with

respect to location or operation for the protection of the community. Such uses are classified in this chapter as 'conditional uses' and fall into two categories:

(1) Uses, either municipally operated by publicly regulated utilities, or uses traditionally required for public convenience.

(2) Uses entirely private in character which, on account of their peculiar locational need or the nature of the service they offer to the public, may have to be established in a district in which they cannot reasonably be allowed as a permitted use under the zoning regulations of the district.

"2. Application for conditional use. An application for a conditional use shall be filed with the plan commission upon such form and accompanied by such information as shall be established from time to time by the plan commission. A fee of twenty-five dollars shall be paid upon the filing of such application for a conditional use permit."

No contention is raised here that Union Electric failed to properly apply for the conditional use permit it sought.

The processing of the application is as follows:

"3. Action by plan commission.

(a) The plan commission shall make its findings and determination within forty days from the date on which the matter is last presented to the commission and shall forthwith transmit a copy thereof to the applicant as well as to the city council. No decision of the commission, however, shall become effective until it is approved by the city council.

(b) In approving the uses referred to in this section, the commission shall have the authority to impose such conditions as it deems necessary to protect the best interests of the surrounding property or neighborhood and this chapter.

"4. Authorization. No application for a conditional use shall be acted upon by the city council until after the plan commission has given notice and held a public hearing and prepared and filed a written report with the city council as provided in section 34–60, subsection (3). In the event that the report of the plan commission is adverse to an application for a conditional use, such use shall not be authorized except by an affirmative vote of at least four members of the city council.

"5. Conditions of issuance. No conditional use shall be granted by the plan commission or the council unless the use:

(1) Is necessary for the public convenience at that location.

(2) Is so designed, located and proposed to be operated that the public health, safety and welfare will be protected.

(3) Will not cause substantial injury to the value of other property in the neighborhood in which it is located.

(4) Except as may be otherwise specified herein, or recommended by the plan commission solely in the case of planned developments, shall conform to the applicable regulations of the district in which it is to be located."

No contention is raised here that any of the required procedural steps were omitted or improperly done. The application of Union Electric reached the council in proper form, with the 5–0 approval of the plan commission following public hearing at which no one appeared in opposition.

Some review of the evidence presented, both before the plan commission and the council, and the proceedings which occurred, is necessary. Five representatives of Union Electric presented the evidence in support of the permit. The representative of the real estate department of Union Electric, with 12 years service in that department, advised the commission that the

proposed substation would comply with all height, area, and setback requirements of the zoning ordinance; that the proposed substation was essential to maintaining the present system in balanced condition; that the growth of electrical usage in the area would by February 1968 have used up the capacity of the substation equipment serving the area; that the site selected would ultimately have three units although only one would be put in immediately; that the cost of the initial unit was estimated at $380,000 and subsequent units would be $200,000; that the lines coming in and going out of the station would be underground in the vicinity of the substation and then would hook into the already existing distribution system; that it is important that the substation be properly located to begin with as it has to be good for ten or twenty years in view of the expense.

An electrical engineer, with Union Electric for 15 years advised the commission that by 1968 the three substations serving the area would be loaded in excess of their capacities; that unless relief was provided overloads would occur jeopardizing the supply of electrical power to the area; these overloads will eventually result in low voltage and inefficient operation of electrical applicances, and could result in power failure causing long outages and possible forced curtailment of electrical usage in the area. He set forth the factors considered in selecting substation sites which include close proximity to the electrical load center of the area to be served and nearness to existing intersecting overhead lines. The Waldron site was selected after careful consideration of these factors, both of which it met.

Another electrical engineer, who had been with Union Electric for 20 years and was responsible for design and construction of proposed substations, advised the commission of the equipment which would be installed. Specifically, he stated that all lines in and out would be underground; that all the equipment would be enclosed by a high chain link fence; that all energized conductors would be either entirely enclosed or elevated beyond the reach of persons; that except for insulating oil (to be kept in a heavy steel case) all material used in the substation would be noncombustible so that fire hazards are reduced to a minimum, less than those in the average commercial building; that the substation would create no radio or television interference, no air pollution, and no parking or traffic problems.

A landscape architect with Harland, Bartholomew and Associates set forth the landscaping contemplated for the substation which need not be stated here. It is enough to say that it included extensive plantings designed not necessarily to hide the entire installation but to make it virtually indistinguishable to the public at any time of year.

In addition to the formal presentation the representatives of Union Electric were subjected to extensive questioning by the commission. Their answers supported the statements set forth in the formal presentation. They were also questioned at length about the possibility of locating the substation at some other site. They responded that this site was the only one within a block of the load center which was large enough for the installation, and available.

Following the original meeting with the commission Union Electric attempted to acquire another site, the Magidson site, at the suggestion of the city planning staff. This attempt was unsuccessful and thereafter the plan commission recommended approval of the conditional use permit. The hearings before the council established the same facts as the presentation before the commission. That hearing also produced a parcel-by-parcel explanation of reasons why sites suggested by the council were unsuitable. All, but the Magidson site, were unsuitable either because too small or because located too far from the electrical load center. The Magidson site was acceptable to Union Electric but the

owner was unwilling to sell. Union Electric was unwilling to condemn this site because it felt this would be an unwarranted abuse of its power of eminent domain. It based its decision in this regard on the fact that it did not need the entire tract and therefore would only be condemning a portion. By taking only a portion, the remainder of the tract would be unsuitable for the development planned by the owner. In addition to the adverse effects upon the landowner, the damages to the remainder of the land would substantially increase the cost of the land to Union Electric. Having already acquired an option on the Waldron site which in all respects satisfied the utility's needs it considered it unwarranted and improper to condemn the Magidson site.

No evidence was submitted to the council except that presented by Union Electric. The minutes of the council show that the concern of its members, both in questions asked and their own statements, was that "hopefully" this area along Olive Street (including the Waldron site) would develop into a high rise apartment area. There was no evidence that such a possibility is any more than wishful thinking of the council members. No evidence exists in this record that anyone has ever expressed an interest in such a development or that the area is suited for such development. Although the zoning provisions concerning specific uses in this area are not before us, the minutes of the council meeting indicate that rezoning would be required for such development.

■ In seeking reversal of the trial court judgment the City argues that the council in refusing the conditional use permit was acting in a legislative capacity, not an administrative one, and if its action is fairly debatable the court cannot substitute its judgment for that of the legislative body. The City also contends that the council could believe or disbelieve the witnesses as to the need for a substation at this site.

The determination of the city council was not a legislative act. The charter of University City provides that the council "In the transaction of legislative business * * * shall act only by ordinance. * *" Here the council did not enact an ordinance. The comprehensive zoning ordinance as enacted by University City provided for conditional uses. It provided the procedure under which they would be granted and the conditions of issuance. Authorization for such conditional uses did not require amendment of the ordinance, enactment of another ordinance, or rezoning. It required only an administrative determination by the plan commission and the city council. The case is controlled by State ex rel. Ludlow v. Guffey, Mo., 306 S.W.2d 552, involving the granting of special use permits in Webster Groves, which was also required to be done by the city council. There also the City contended that the action of the council was legislative, not administrative. In rejecting this contention the court en Banc stated:

"* * * That is to say, the fact that the Webster City Council was generally a legislative body does not determine that it could not or did not act administratively when it was engaged in the enforcement (an administrative function) rather than in the enactment (a legislative function) of a zoning regulation." (l. c. 557)

The determination of the council was administrative in nature, and it must make such determination reasonably, and not arbitrarily, upon the evidence before it. The ordinance here provides the guidelines under which the council may exercise its discretion. If the ordinance did not so provide it would be subject to the attack made in *Guffey* that an ordinance which attempts to clothe an administrative officer or body with arbitrary discretion with no definite standard or rule is a delegation of legislative functions and is unconstitutional. This is true even where the administrative body is also the legislative body. State ex rel. Ludlow v. Guffey, *supra*, [4].

The only guidelines for council consideration are four in number:

(1) Necessary for public convenience at the location; and

(2) Designed, located and proposed to be operated so that the public health, safety and welfare will be protected; and

(3) Will not cause substantial injury to the value of other property in the neighborhood; and

(4) Conforms to the applicable regulations of the district.

We approach these in reverse order. Union Electric's evidence and exhibits established that all regulations of the district, such as set-back lines, area provisions and height restrictions would be fully complied with. There was no evidence to the contrary.

The property surrounding this site contains basically retail businesses, including a dry cleaner-laundry, service stations, a furniture refinishing business, some residences, and, in close proximity across the street, super-markets. Union Electric's evidence and exhibits established that as proposed the substation would not adversely affect the property values, and would in all probability improve them. There was no evidence to the contrary and no objection raised at any time by nearby property owners.

The evidence of Union Electric established that fire hazards from the substation were minimal, less than the average commercial building. It established that through grounding, fencing, height provisions, and enclosures the chances of injury from contact with electrical equipment were minimal. No traffic or parking problems would be created and the power lines in and out of the building would be underground. The landscaping proposals assure that the property will not be an eyesore, but will in fact be more attractive than it presently is or than the neighboring property. The character of the neighborhood and the recent erection of supermarkets across the street refute the concern of the council that the substation would adversely effect "a civic asset"—Heman Park—one block away. The landscaping and construction of the proposed substation are more in keeping with a park than the hodge-podge neighboring the Waldron site. Again there was no evidence before the council which would support a decision to deny the permit on this basis. No air pollution would be created. No evidence was presented to establish or even infer that the substation would have any adverse effect on the health, safety or welfare of the community. The evidence compelled the conclusion that a new substation in this area was indispensable to continued adequate electrical service to the public.

This brings us to requirement one, that the substation was necessary for the public convenience at this location. The minutes of the council meeting make it abundantly clear that the members thought another site was available which they preferred. Their insistence on condemnation by Union Electric of the Magidson site and statements that another alternative was available, unpleasant as it might be, all attest to this attitude. There can be no doubt that a substation within a block of Midland and Olive was essential for continued adequate electrical service, certainly a public convenience. It is equally clear that only the Magidson site and the Waldron site met the requirements for a substation. The council's position essentially is that "necessary" means "absolutely the only site available in the area." To acquire the Magidson site Union Electric would have to condemn a portion of a tract of land, resulting in preventing the owner from using the remainder in accord with his planned use and causing additional expense to the utility from damages to the residual estate, where it already has the rights to an adequate site a block away which will in no wise affect the value of surrounding property or the public health, safety and welfare. It must also

be remembered that as to a public utility almost any site can be acquired by condemnation. If the position of the council has validity it means that a city may require a utility to condemn a tract with a high rise office building when it already owns a vacant lot across the street. The discretion of the council under the ordinance can not be expanded so far. "Necessary" is a word susceptible of various meanings ranging from absolute physical necessity (the council's position) to convenient, useful, appropriate, suitable, proper or conducive to the end sought. See Black's Law Dictionary, 4th Edition. If conditional uses may be allowed in a district only on a showing of absolute necessity then we must ignore the provision of the ordinance establishing such uses, which allows them when necessary or *desirable*. "Necessary" as used in the guidelines of this ordinance means suitable, proper and convenient to the ends sought.

Under any circumstances, the term carries with it, in this ordinance, the concept of reasonableness. The location of the substation on the Waldron site was necessary because no other site was both satisfactory and reasonably available.

◼ We believe the council has misconceived the obligation which Union Electric bears in asking for this permit. Union Electric must establish the need for the substation in this area, which it has done. It is required to establish the other conditions for issuance, which it also has done. If there is evidence that the site selected was unreasonably selected, or selected in bad faith, or that the site selected interferes with a presently existing plan of development and an alternative site is reasonably available, or that one of the guidelines is not met, then the council as an administrative body may apply its discretion to the evidence before it. But here there is no evidence of any of the above. The refusal was solely on the basis that the council was "hopeful" of some other development. The action of the council in refusing the permit was an abuse of its administrative discretion under the ordinance. It was not based upon the guidelines provided by the ordinance and was therefore illegal.

◼ The City also relies upon the proposition that the council could base its refusal to issue the permit upon a disbelief of the evidence presented by Union Electric. There are cases which state that an administrative body may decide a claim solely upon a *finding* of lack of credibility of uncontradicted and unimpeached testimony offered in support of the claim. See Scott v. Wheelock Bros., 357 Mo. 480, 209 S.W.2d 149. This theory, however, does not insulate the council from judicial review for as stated in Vlasak v. Alternative System of Police Retire. Sys., Mo.App., 435 S.W.2d 726, 1. c. 729:

"* * * It is true, as the respondent contends, that the Board is the judge of the credibility of witnesses, but that rule does not authorize it to arbitrarily disregard and ignore competent, substantial and undisputed testimony of witnesses who are not shown by the record to have been impeached, and to base their findings upon conjecture or their own mere opinion, unsupported by sufficient competent evidence. * * *"

See Koplar v. State Tax Commission, Mo., 321 S.W.2d 686 [6].

◼ Aside from the preposterous notion that the council members were better able to judge the need for and location of a substation than the representatives from Union Electric, it is clear that the council made no finding of lack of credibility of the Union Electric representatives, nor is there any basis in the record for such a finding. The basis of the council action was the conjecture, opinion, and hope of its members, unsupported by any evidence, that Olive Boulevard would develop in a certain way in the future.

Throughout the entire proceedings before the plan commission and council it was never seriously contended that a sub-

station was not needed nor that any site other than the Waldron site and the Magidson site was suitable. The action of the council was based not on a lack of belief of the witnesses but upon its misconception that it had a right to force the utility to condemn the precise tract the council determined should be used.

The action of the trial court in reversing the action of the city council is correct and is affirmed. The only permit applied for by Union Electric was a conditional use permit. The trial court as part of its judgment ordered issuance of a building permit. Building permits do not necessarily follow use permits as a matter of course, and the record here does not set forth the procedure or requirements for obtaining a building permit. The cause is therefore remanded with directions to enter a judgment ordering the City through its proper official to issue to Union Electric a conditional use permit for an electrical substation on the premises at the northwest corner of Waldron Avenue and Olive Boulevard in University City, Missouri. Costs against respondent.

PER CURIAM:

The foregoing opinion by SMITH, C., is adopted as the opinion of this court. Accordingly, cause is remanded with directions to enter a judgment ordering the City through its proper official to issue to Union Electric a conditional use permit for an electrical substation on the premises at the northwest corner of Waldron Avenue and Olive Boulevard in University City, Missouri. Costs against respondent.

WOLFE, P. J., and BRADY and DOWD, JJ., concur.