Kay DREY et al., Appellants,

v.

Gene McNARY, St. Louis County Supervisor, et al., Respondents.

No. 58867.

Supreme Court of Missouri, En Banc.

Nov. 10, 1975.

Rehearing Denied Dec. 8, 1975.

Lewis C. Green, St. Louis, for appellants.

Thomas Wehrle and Morton Golder, and George W. Lang, II, Wayne B. Wright, Clayton, for respondents.

PER CURIAM:

In this action plaintiffs sought both a declaratory judgment and an injunction relative to (1) the use that may be made of the proceeds of general obligation bonds and revenue bonds approved by the people of St. Louis county for public parks and recreational facilities purposes; and (2) the validity of pledges by the County of (a) specified revenues to payment of the revenue bonds, and (b) other revenue in general to payment of the cost of operating and maintaining the recreational facilities. The trial court granted part of the relief requested, but denied other parts and from that part of the judgment plaintiffs appealed to the Court of Appeals, St. Louis District. The case was transferred to this court for review after an opinion had been filed in the court of appeals. We utilize parts of the opinion of that court.

Plaintiffs are residents, property owners and taxpayers of St. Louis county and active members in organizations interested in preserving open space and parks in the county. The defendants are the Supervisor, the Director of Parks and Recreation, and the members of the County Council of St. Louis County.

In early 1969 plaintiffs and defendants were allies actively supporting the approval of two bond issues by the voters of St. Louis county. Those bond issues, approved at an election held June 3, 1969, were for the purpose of acquiring new park sites in the county and the erection of certain new recreational facilities. One proposition authorized general obligation bonds; the other revenue bonds. As submitted to the voters, the two bond issues were:

PROPOSITION NO. 2

Proposition to issue the bonds of St. Louis County, Missouri, to the amount of NINETEEN MILLION, THREE HUNDRED EIGHTY THOUSAND DOLLARS ($19,380,000) to provide funds for the purpose of purchasing, improving, and equipping lots, tracts and parcels of ground, and land to be used as public parks and playgrounds and for recreational purposes.

PROPOSITION NO. 3

Proposition to issue Public Recreation System Revenue Bonds of St. Louis County to the amount of FIVE MILLION FIVE HUNDRED THOUSAND DOLLARS ($5,500,000) to provide funds for the purpose of establishing, equipping and developing a system of public recreation, including parks and other recreational grounds, playgrounds, recreational centers, swimming pools and any and all other recreational areas, facilities and activities; said bonds to be payable, both principal and interest, from revenues to be derived from the facilities acquired through the issuance of said bonds.

The route by which these propositions reached the ballot is pertinent. Under the

St. Louis County Charter [1] the Supervisor is required to submit to the County Council a budget, a capital program and an accompanying message. The capital program "shall contain at least (1) a clear, general summary of the program, (2) the capital improvements pending and proposed to be undertaken during the five fiscal years next ensuing, together with the estimated cost of each improvement *and the pending or proposed method of financing it,* * * *." (Emphasis supplied.)

Pursuant to this directive, the Supervisor on March 27, 1969, submitted to the County Council a summary of the proposed St. Louis County Capital Improvement Program for the years (presumably fiscal) 1970 through 1974. Under the proposals for parks and recreational facilities was a recommendation for $19,348,734 in general obligation bonds to (1) acquire seven new parks ($11,278,950), (2) acquire approximately 800 acres of land to be utilized for three eighteen-hole golf courses ($4,305,779), and (3) improve existing parks ($3,764,005). Also included was the statement: "To develop these golf courses, plus three ice-skating/hockey rinks, and three swimming pools for all the people of St. Louis County, an issue of $5,484,060 in revenue bonds is proposed. The people who use these facilities would pay the cost of the bonds with 'user-fees.'" Listed among the "New Parks" was what is known as the Queeny Tract. Listed as a proposed public golf course was the Northwest Golf Course site (to include golf course, swimming pool, ice-skating/hockey rink) located some considerable distance north and east of the Queeny Tract.

In the letter of transmittal accompanying the summary the Supervisor recommended that the "County Council take the necessary legislative action" to place the proposed bond issues on the June 3, 1969, ballot. This letter of transmittal again delineated between the general obligation bonds of $19,380,000 for acquisition of new parks and land for recreational complexes and the revenue bonds of $5,500,000 to develop golf, ice-skating/hockey rink and swimming pool facilities on land acquired with the general obligation bonds.

On April 24, 1969, the County Council, pursuant to the Charter, passed ordinance 5040 which called a special election on June 3, 1969, to authorize the general obligation and revenue bond indebtedness. The first paragraph of that ordinance begins:

"WHEREAS, the County Supervisor in a report dated March 27, 1969, recommended to the County Council that an election be held in said County to authorize the incurring of indebtedness and the issuance of General Obligation bonds of said County in the following amounts for the following purposes, to-wit: . . .

"NINETEEN MILLION, THREE HUNDRED EIGHTY THOUSAND DOLLARS ($19,380,000) to provide funds for the purpose of purchasing, improving, and equipping lots, tracts and parcels of ground, and land to be used as public parks and playgrounds and for recreational purposes."

The second paragraph read in part:

"WHEREAS, the aforesaid report of the County Supervisor recommended that at an election to be held in said County a proposal be submitted to authorize the issuance of Public Recreation System Revenue Bonds of said County in the following amount for the following purpose, to-wit:

"FIVE MILLION, FIVE HUNDRED THOUSAND DOLLARS ($5,500,000) to provide funds for the purpose of establishing, equipping and developing a system of public recreation . . .."

Plaintiffs introduced voluminous evidence that prior to the election an extensive publicity campaign was conducted in support of

---

1. We take judicial notice of the Charter. See *Giers Imp. Corp. v. Investment Service, Inc.,* 361 Mo. 504, 235 S.W.2d 355, 358[4] (1950); *State ex rel. Union Electric Co. v. University City,* 449 S.W.2d 894 (Mo.App. 1970).

the bond issues. Citizens groups, environmental groups and county officials were part of this campaign. We need not review the evidence in detail other than noting that Proposition 2 was treated in the campaign as bonds for the acquisition of land for parks and improvement of existing parks. Proposition 3 was treated as bonds for development of three ice-skating/hockey rinks, three golf courses and three swimming pools to be paid for by users at "no cost to taxpayer."

Following the election a feasibility study of the potential market for the revenue bonds was made. The results were discouraging at best. It was determined that the market for revenue bonds backed only by the income from county recreational facilities was poor and, if salable at all, required a high rate of return. The record warrants the conclusion, that faced with this financial picture and cognizant of the desires of the electorate as evidenced by the election, the county administration sought ways to improve the marketability of the bonds by increasing their security. The ultimate result encompassed several proposals.

The Queeny Tract of 569 acres was acquired by the county with general obligation bond money. A master plan for the development of that site had been prepared for the county by Sverdrup and Parcel and Associates, Inc., engineers, architects and planners. That plan called for development on the Queeny Tract of a family recreational center. Included would be an 18-hole golf course, an ice-skating arena, a swimming pool, clubhouse, children's play area, tennis courts and parking. In addition a large area of the tract containing a hardwood forest would be left in its natural state for hiking, picnicking, and other similar activities. In contemplation of development of the site in accord with the master plan of Sverdrup and Parcel, and conditioned upon such development, Mrs. Edgar Queeny entered into a contract for gift with St. Louis County. In exchange for her gift of $1,000,000 the county promised (1) to name the park after the donor's husband, (2) to procure from another donor at least $1,000,000 to defray development costs, and (3) to appropriate from the 1969 Park Bond Issue Fund (the general obligation bonds) $1,800,000 as the county's portion of the costs of development of Phase I of the master plan. The second $1,000,000 gift was obtained from the private Greensfelder Foundation. The recreational complex in Queeny Park would take the place of one of the three recreational centers originally proposed in the Capital Improvement plan.

Thereafter, the County Administration developed a prospectus relating to the proposed sale of the $5,500,000 in revenue bonds authorized by Proposition 3, which prospectus was furnished to potential bidders on the bonds. Contained therein are the following statements:

(1) "All costs of . . . engineering, and architectural fees [for the three recreational complexes] have been paid or will be paid from the General Obligation bonds . . ."; (2) "The County will pay for the construction and operating costs of the ice rink and swimming pool facilities . ." at Queeny Park; (3) "the gross revenues of all three golf, ice and swimming facilities will be pledged for the payment . . ." of the revenue bonds; (4) "The County will make up any deficit from other funds available";[2] (5) as to Queeny Park "Architectural and engineering fees of $265,000, equipment costing $200,000 and an estimated $2,800,000[3] for constructing the ice rink,

---

2. The trial court ordered stricken this and any like representations pledging the general credit of the county to the revenue bonds. The County has not appealed from this part of the decree.

The decree also ordered that plaintiffs have the right to inspect at reasonable times the feasibility study and prospectus pertaining to the revenue bonds and referred to in the pleadings and evidence. The County also has not appealed from this part of the decree.

3. The record is unclear of what this $2,800,-000 is composed. Under the Queeny gift

swimming facilities, tennis courts and an elaborate creative children's playground are being provided from General Obligation bond proceeds and contributions"; and (6) "The Queeny County Park Ice Rink and Swimming Pool will require no Revenue Bond monies for construction; the county will also pay the operating expenses for these facilities out of the regular Operating Fund (Park Maintenance Fund) * * * The revenues from the ice rink and swimming pool, however, will be used to service the debt on the $5,500,000 Revenue Bond Issue, * * *."

The ordinance embodying the scheme of financing and authorizing issuance and sale of the revenue bonds, drafted by its attorneys for adoption by the County Council (and which we may conclude would have been adopted but for this suit), provided that the county covenanted with the purchasers (1) that it would operate and maintain these recreational facilities as long as any of the bonds were outstanding and unpaid; and (2) that it would pay the cost of operating and maintaining these facilities from any county funds (including tax monies) available for that purpose, it having pledged the *gross* revenues produced by these facilities to payment of principal of and interest on the bonds.

A brief analysis of the original plan submitted to the voters and a statement of the nature of general obligation and revenue bonds may be useful.

As initially proposed the citizens were to vote on two separate but related proposals. The first was for the acquisition of extensive park land and certain improvements to *existing* parks. This land and those improvements were to be financed by general obligation bonds of the County which in turn imposed upon the electorate an increase in taxes to service and retire the bonds. The Capital Improvements Program, the Supervisor's letter, and the publicity listed the proposed land to be acquired and the improvements to be made. All

evidenced the concern that available space for park sites was rapidly disappearing in St. Louis county and that such space had to be acquired immediately or it would be forever lost. Included in this proposal was the land for development of three family recreational areas, the sites of which were not specifically described but were indicated as additional to the park sites specifically described. The Queeny site was listed as a park site specifically described.

The second proposition was for the development of the three recreational areas proposed to be built upon land acquired through the first proposition. These developments were each to include a swimming pool, skating rink and golf course. Whereas, the parks were intended to be free to the public, the pools, rinks and golf courses were not. It was therefore contemplated that those facilities would be constructed with revenue bonds which would be retired from the fees charged the users of those facilities. The Capital Improvement Program, the Supervisor's letter, and the publicity before the election indicated that *development* of these facilities would be at no cost to the taxpayer. While the proposals were related they were not interdependent; the electorate could adopt both, neither or either. Adoption of the general obligation bond proposal would authorize acquisition of the park sites even though development of recreational complexes on some of them were rejected by defeat of the revenue bond issue. Adoption of the revenue bond issue would authorize development of recreational complexes upon whatever land was available to the county even if the acquisition proposal were defeated.

 General obligation bonds are just what the term implies: general obligations of the governmental body issuing them. They place the general credit of the sovereign behind them and are an indebtedness of that sovereign within the meaning of Mo.Const. Art. VI, § 26, restricting the lim-

$1,000,000 was to be from Mrs. Queeny, $1,000,000 from another donor (Greensfeld-

er) and $1,800,000 from proposition 2 bonds or a total of $3,800,000.

its of debt which a county may incur. They require tax money to service and retire them. Revenue bonds do not have these characteristics. Their repayment is dependent upon revenue from the facility which they are issued to create. They do not rely upon the general credit or tax money of the sovereign and they are not indebtedness within the limitations of the constitution. *State ex rel. City of Hannibal v. Smith*, 335 Mo. 825, 74 S.W.2d 367 (1934); *City of Lebanon v. Schneider*, 349 Mo. 712, 163 S.W.2d 588 (1942).

There are at least two practical reasons why a political subdivision may select revenue bonds rather than general obligation bonds to finance a given project. One is the indebtedness limitation of the constitution. The other is the greater willingness of the electorate to approve projects where no increase in taxes will occur as a result. For this latter reason projects which are of lesser urgency, value or use to substantial portions of the electorate can be created through user-fee revenue bonds, when they would be unable to command sufficient electoral support if financed by all taxpayers.

Plaintiffs' major contentions are: (1) placing a recreation center in Queeny Park is unlawful; (2) development of the swimming pool and skating arena in Queeny Park with general obligation bond money is unlawful;[4] (3) the pledge of the park maintenance fund (tax monies) to operate and maintain the pool and rink at Queeny Park is unlawful; (4) the pledge of gross revenues of all three recreational facilities (including those at Queeny) to the payment of the revenue bonds and any pledge to pay the cost of operating and maintaining these facilities from the park maintenance fund so long as any of the revenue bonds are outstanding is unlawful.

■ We are unable to conclude that the proposal to locate a recreational center in Queeny Park is contrary to law or that it is contrary to the propositions voted by the people. It is true that the original plans called for acquisition of a site other than Queeny Park for the location of a recreational center. But Proposition 2 as submitted to the voters did not specify what land would be acquired; nor did Proposition 3 specify the location of the recreational sites. There is no evidence of fraud or misrepresentation or that the original plans did not represent the intentions of the County Administration at the time they were prepared or the election was held. It is unrealistic to require that every facet of a proposed plan for the expenditure of bond issue money be inflexibly adhered to, unless that facet is specifically submitted as a part of the proposition itself upon which the people vote. Inflation, unavailability of a particular tract, excessive land costs, unexpected gifts, relocation of access roads, industrial, commercial or residential development, or many other causes may make the original plans impractical, unfeasible, impossible or simply not the best plan when implementation actually begins. The courts have not required inflexibility so long as the purposes for which the bonds were voted are adhered to. *St. Louis County v. State Highway Commission*, 409 S.W.2d 149 (Mo.1966); *Petition of the City of St. Louis,* 363 S.W.2d 612 (Mo. banc 1963); *Thompson v. City of St. Louis*, 253 S.W. 969 (Mo.1923).

■ Proposition 2 provided for the acquisition of land for use as parks and playgrounds and for recreational purposes. The Queeny Tract was acquired from the proceeds of that bond issue for those purposes. Proposition 3 provided for development of recreational facilities, without regard to location, of the type now proposed for Queeny. Location of such a complex in Queeny is not contrary to either proposition. The two million dollars in gifts upon location of

4. There is no contention that the county intends to utilize general obligation bond money for the Queeny Park golf course so

we deal specifically only with the rink and pool.

these recreational facilities in Queeny represented a benefit to the citizens of the county which the administration was bound to consider. The master plan for the development of Queeny proposes a park with a far broader range of recreational facilities than simply leaving the park in its natural state as plaintiffs apparently suggest. Much of the park is to be left in its natural state for those citizens who want that type of recreation. But the County Administration may properly consider that not all, and maybe not even most, of its citizens are interested in the type of recreation plaintiffs are. Golf courses, swimming pools, ice-skating rinks, tennis courts and children's play areas are also recreational facilities which by common knowledge are frequently found in municipal and county parks. To include them in Queeny is not, as plaintiffs contend, to deprive the people of their regional park.

Nor do we find any merit to plaintiffs' contention that the proposed plan is to develop a country club for the wealthy. Aside from the fact that the wealthy are also taxpayers and citizens, there is no fact basis for plaintiffs' conclusion. Queeny is located in a section of the county which has a higher than average per capita income. But plaintiffs are not quarreling with the acquisition of Queeny as a park site; in fact, they wholeheartedly favor it. The area is readily accessible by major highways which connect with arterial highways servicing the entire county. The facilities objected to will be available at costs comparable to those at other public facilities. There is no basis to conclude that the development will be used by any limited segment of the county population. The development of Queeny as proposed is within the scope of the propositions submitted, and is a permissible development of the land acquired.

■ The use of the general obligation bond money is limited to the purposes for which it was voted. Such money is similar to trust money and may be utilized within the scope of the proposition approved by the people but not beyond. *Thompson v. City*

*of St. Louis,* supra. Respondents urge us to look to the wording of Proposition 2 alone and conclude that it is sufficiently broad to encompass the building or development of skating rinks or swimming pools. Proposition 2 provides funds for "purchasing, improving and equipping" land for "parks, playgrounds and for recreational purposes." Whether this language, standing alone, would authorize use of general obligation bond money for development of the swimming pool or skating rink we need not decide. We cannot ignore the fact that Proposition 2 and Proposition 3 were submitted to the people together. *Grossman v. Public Water Supply Dist. No. 1 of Clay County,* 339 Mo. 344, 96 S.W.2d 701 (1936). In construing the meaning of Proposition 2, not only is the existence of Proposition 3 relevant, but the legislative history which resulted in the propositions being placed on the ballot is also relevant. *City of St. Louis v. Pope,* 344 Mo. 479, 126 S.W.2d 1201 (1938). The ultimate question is what did the voters approve and any doubts must be resolved in favor of the taxpayers. *State ex rel. State Building Commission v. Smith,* 336 Mo. 810, 81 S.W.2d 613 (1935).

■ We conclude that the propositions as submitted did not contemplate the use of general obligation bond money to construct swimming pools, skating rinks or golf courses. While the language of Proposition 2 is broad the words "improve" and "equip" connote a lesser expenditure than the word "develop" used in Proposition 3. Proposition 2 deals predominantly with the acquisition of land for parks. Proposition 3 deals with the development of a "system of public recreation" including specifically "swimming pools." Because it contemplated revenue bonds to be paid from the facilities acquired, Proposition 3 obviously dealt with a type of facility where a charge for use would be imposed. The record demonstrates that the county was not in a position where it was required to issue revenue rather than general obligation bonds because of constitutional limitations on its indebted-

ness. The record rather supports the conclusion that revenue bonds were proposed because the facilities contemplated were of the type for which general taxpayer support is difficult to achieve unless the cost is borne by those using the facilities. The Supervisor's Capital Improvement Plan and his transmittal letter requesting the election clearly evidenced the intention that the proposed golf courses, pools and rinks were to be financed through user-fees, not by taxes. These documents also evidenced the intention that the general obligation bonds were to finance land acquisition and limited improvements to the land acquired and to existing parks. The facilities acquired through the general obligation bonds were, by their very nature, the type in which revenue financing would be improbable, if not impossible. These documents furnished by the Supervisor were specifically referred to in the ordinance submitting the bonds to the electorate, and the amounts of bonds covered by each proposition were the same as those proposed by the Supervisor. The publicity campaign, which is a part of the history of the election (See *City of St. Louis v. Pope*, supra) clearly indicated that the pools, rinks and golf courses were to be built with Proposition 3 money at *no cost to the taxpayer.* There is no serious contention that at the time of the election this was not the plan.

However broadly the language of Proposition 2 was worded, the legislative history and the wording of Proposition 3 clearly establish that the golf courses, rinks and pools were not included within Proposition 2. Funds from that Proposition were not for those purposes and may not now be so used. We cannot speculate nor presume that the voters would have approved Proposition 2 had they believed or had reason to believe that their taxes would be used to construct these facilities.

■ The provisions of our constitution and statutes requiring voter approval before certain substantial increases in taxes can be effected, serve a salutary purpose and reflect the intention of the people to retain to themselves a control over taxing power. It is imperative that when voters are asked to levy taxes against themselves they understand that the taxing body and the courts will limit use of funds to the purpose voted. The conclusion is inescapable that the pools, rinks and golf courses were not to be built with Proposition 2 money and the tax increase approved under that Proposition was for purposes other than those three items. Perhaps unnecessarily, we emphasize the distinction between a change of plans to effect the purpose (the issue presented in the first contention) and a change of the purpose itself (the issue presented in the second contention).

■ Plaintiffs seek to enjoin the use of general obligation funds to create the recreational facility at Queeny. This record does not support such relief, for it does not establish that use is proposed or contemplated. We must point out that all we have held is that Proposition 2 money is not usable to construct a rink, pool or golf course. We, of course, have in no way held that such pool or rink must be built solely with Proposition 3 funds; only that it cannot be built with Proposition 2 money. Nor have we held that Proposition 2 money may not be used to improve or equip Queeny (or any other park) with facilities other than the three (rink, pool and golf course) specifically exempted from Proposition 2 by the legislative history and Proposition 3. Both propositions are broadly worded and it may well be that certain types of recreational facilities can be created under either or both. The Queeny Contract for Gift and the Prospectus both indicate that the County proposes to use the two million dollars in gifts and some additional general obligation funds for development of the park site in accordance with Phase I of the master plan. Phase I contemplates more than the pool, rink and golf course. It also includes items not exclusively covered under Proposition 3 such as tennis courts, parking, roads, etc. The gifts are not Proposition 2 funds and may be used for whatever public purpose

their donors direct, including a pool and rink. We have no basis on the record before us for determining that general obligation funds will be used for the rink or pool rather than for other permissible equipment or improvements.

Plaintiffs' contentions (3) and (4) are closely related and may be considered together. They present the ultimate question of whether without the approval of the electorate the County may, in support of the revenue bond issue, obligate itself now to pay from tax funds in future years any part of the cost of operating and maintaining the recreational facilities (golf course, ice-skating/hockey rink and swimming pool) at the three parks during the life of the bonds.

Plaintiffs do not contend that the revenue bond issue is invalid for these reasons and they do not ask that it be declared void or that the sale be enjoined; they ask merely for a declaratory judgment as to the validity and enforceability of this pledge or obligation in support of the revenue bond issue.

■ Plaintiffs argue that this obligation of tax funds violates Mo.Const. Art. VI, § 26(a). We agree. This provision of the constitution authorizes the obligation of current revenues to the extent of the income during the year a debt is created, but it prohibits the anticipation of the revenues of any subsequent years without authority from the electorate. *Trask v. Livingston County,* 210 Mo. 582, 109 S.W. 656, 659 (1908). An undertaking by the county to operate and maintain these facilities with its general revenue for the life of these bonds would create a present indebtedness and obligate the county to levy taxes in subsequent years for its payment. It is not a contingent obligation. For these reasons the provision in the ordinance that the county agrees to pay the cost of operating and maintaining these recreational facilities so long as any of the bonds are outstanding and unpaid is void and unenforceable. *Scroggs v. Kansas City,* 499 S.W.2d 500

(Mo.1973); *Wunderlich v. City of St. Louis,* 511 S.W.2d 753, 756[1] (Mo. banc 1974).

■ Plaintiffs raise several other points which will be discussed briefly. We cannot find objectionable the use of general obligation bond money for architectural and engineering studies on the recreational sites. Those sites were acquired with general obligation bond money and part of the development may well include items other than the pools, rinks and golf course. Use of that money is not contrary to the propositions voted.

■ Plaintiffs have leveled an attack upon the motives and good faith of the county administration. Such an attack is wholly unsupported by the record. The use and financing of bond issue projects is certainly not free from doubt legally. The record here warrants only the conclusion that the county administration, faced with an economic picture detrimental to the revenue bond project, attempted to carry out the expressed will of the electorate to build the recreational centers.

■ Plaintiffs ask also that the court issue a broad direction concerning availability of public records. Such an order is beyond the scope of this proceeding and would be an advisory opinion. If violations of § 109.180 RSMo 1969 should occur at some time in the future, there are courts and remedies available.

Respondents' motion to dismiss appeal, taken with the case, is overruled.

■ Plaintiffs' contention that they are entitled to recover taxable costs both on appeal and in the trial court has merit. The suit was filed by plaintiffs in the public interest on behalf of themselves and all other citizens and taxpayers of the county interested in the development and financing of public parks. The trial court, recognizing that plaintiffs had prevailed in that court on a small portion of the major issues, apportioned the costs, one-fourth against defendants and three-fourths against plain-

tiffs. As a result of review by the court of appeals and by this court, plaintiffs have prevailed in all but one of the major issues presented by them. Plaintiffs are the prevailing parties within the meaning and intent of §§ 514.060 and 514.160, RSMo 1969, and should recover all the taxable costs, the amount thereof to be determined by the trial court and expressed in the judgment entered upon remand of this case. *Underwood v. Oregon County*, 320 Mo. 514, 8 S.W.2d 597, 598[3] (1928); *Hart v. T. L. Wright Lumber Co.*, 355 Mo. 397, 196 S.W.2d 272, 278[6, 7] (1946).

The judgment that "the recreational center as now proposed may be built within the confines of Queeny Park" is affirmed; the remainder of the judgment, except the two parts not appealed from by defendants (referred to in footnote 2), is reversed. The cause is remanded with directions that the trial court enter judgment consistent with this opinion.

All concur.