James Thomas SPRADLIN,
Respondent/Cross–
Appellant,

v.

The CITY OF FULTON, Missouri, et al.,
Appellants/Cross–Respondents.

No. 78317.

Supreme Court of Missouri,
En Banc.

May 23, 1996.

James W. Erwin, Rhonda C. Thomas, Jeffrey R. Fink, St. Louis, David Brydon, Sondra B. Morgan, Jefferson City, for Appellants–Respondents.

John L. Patton, Columbia, for Respondent–Appellant.

Mark D. Grimm, Nancy N.C. Lear, St. Louis, for amicus curiae, Missouri Municipal League.

ROBERTSON, Judge.

Article III, section 38(c) of the Missouri Constitution and the Neighborhood Improvement District Act, sections 67.453–67.475, RSMo 1994 and RSMo Supp.1995, permit cities and counties to form neighborhood improvement districts and to issue general obligation bonds to fund improvements in such districts. There are three issues in this case: First, whether a city or county may form a neighborhood improvement district where the land in the district is owned by a single entity and contains neither extant dwellings nor multiple residents; second, whether article VI, section 26(f), requires a city or county issuing bonds pursuant to article III, section 38(c), to provide for the collection of an annual tax on all of the taxable tangible property in the city or county; and third, whether article VI, section 26(b) and article X, section 22(a) of the Missouri Constitution require voter approval before a city or county may issue neighborhood improvement district bonds.

We have jurisdiction. Mo. Const. art. V, § 3. First, the trial court held and this Court holds that under article III, section 38(c), and the Neighborhood Improvement District Act, §§ 67.453–67.475, a city may create a neighborhood improvement district from a single, unoccupied parcel of property. Second, the trial court assumed that article VI, section 26(f), requires the city to provide for a tax on all taxable tangible property in the city when the city issues neighborhood improvement district bonds and held that a city or county may not issue general obligation bonds to fund improvements in a neighborhood improvement district without voter approval as required by article X, section 22(a). We hold that article III, section 38(c), conflicts with and supersedes article VI, section 26(f), and that a city may issue general obligation bonds to fund improvements in a neighborhood improvement district without providing for a city-wide tax on all taxable tangible property. Third, we also hold that a city may not provide for an annual tax against all taxable tangible property within the city to service the debt on neighborhood improvement bonds without voter approval pursuant to article VI, section 26(b) of the Missouri Constitution. The judgment of the trial court is affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.[1]

I.

A.

In 1990, the voters approved an amendment to the constitution permitting the gen-

---

1. The Court sustained the City of Fulton's motion to expedite review in this case. The initial opinion circulated in this case did not command a majority of the Court. Therefore, the Court reassigned the opinion. Despite disagreement, the members of the Court on both sides of the issue have worked diligently to decide this case promptly.

eral assembly "to authorize cities and counties to create neighborhood improvement districts." Mo. Const. art. III, § 38(c) ("section 38(c)"). The new constitutional language did not define a neighborhood improvement district nor did it establish a limit on the purposes that such a district might serve, leaving to the general assembly its usual task of providing definition and purpose.

In 1991, the general assembly enacted the Neighborhood Improvement District Act (the "Act"). §§ 67.453–67.475, RSMo 1994 and RSMo Supp.1995. The Act permits a city or county to create a "neighborhood improvement district" within its boundaries and to issue general obligation bonds to finance the proposed improvements within the designated district. Mo. Const. art. III, § 38(c).1; § 67.455. Creation of a neighborhood improvement district requires two-thirds of the landowners of record within the proposed district to petition the city or two-thirds (at some elections, four-sevenths) of the voters residing in the proposed district to approve the creation of a neighborhood improvement district. In addition, the city council must approve the plan. § 38(c).2; §§ 67.457.2, .3 & .4. Special assessments against the property deemed benefitted by such improvements are used to reimburse the city for payments the city makes on the bonded indebtedness it assumes in funding improvements to the district. § 38(c).1; § 67.461. The constitution and the Act assume that special assessments against the benefitted property will meet the debt service on the bonds. Neither the Act nor section 38(c) provide for a city-wide vote before general obligation bonds are issued.

The Act also contains several definitions relevant to this case. Section 67.453(6) defines a "neighborhood improvement district" as:

an area of a city or county with defined limits and boundaries which is created by a vote or by petition [2] under sections 67.453 to 67.475 and which is benefitted by an improvement and subject to special assessments against the real property therein for the cost of the improvement.

To "improve" means "to construct ... or to otherwise perform any work which will provide a new public facility...." § 67.453(4), RSMo Supp.1995. An "improvement" includes:

"[A]ny ... improvements which confer a benefit on property within a definable area.... Improvements include, but are not limited to, the following activities: ... (f) To improve parks, playgrounds and recreational facilities; ... (l) To ... improve any other public facilities or improvements deemed necessary by the governing body of the city...."

§ 67.453(5), RSMo Supp.1995.

**B.**

Callaway County Golf Partners ("CCGP"), a limited liability company, proposed construction of a public golf course to Fulton's city council. Under the proposal, CCGP agreed to purchase land, to improve the land with a golf course, to lease the golf course to the City for use as a public recreational facility, and to operate and manage the golf course for the City. The City Council approved the plan and CCGP purchased approximately 268 acres of land. CCGP, as sole owner of the property, then petitioned the City Council to establish 187.87 acres of the land as the Fulton Golf Course Neighborhood Improvement District. As proposed, the 187.87 acre tract would be used exclusively as a golf course. At the time of the CCGP petition, the tract contained no residences or residents.

The City adopted Ordinance 690–95 creating the neighborhood improvement district and authorizing the issuance of $3,110,000 in general obligation bonds to finance the golf

---

**2.** The "created by vote or petition" language of the statute closely mimics the constitution, which permits a neighborhood improvement district only when approved by the vote of a percentage of electors voting thereon within such district, or by a petition signed by the owners of record of a percentage of real property located within such district, that is equal to the percentage of voter approval required for the issuance of general obligation bonds under article VI, section 26.

Mo. Const. art. III, § 38(c)2; cf. § 67.457, RSMo 1994.

course improvements. The City also enacted Ordinance 692–95, which authorized a special assessment against the district property to pay the cost of the bonds and provided that, in the event the special assessment against the district property did not meet the debt service on the bonds, the City could levy an ad valorem tax against all taxable tangible property in the City to meet the shortfall. The ordinances did not provide for voter approval prior to issuance of the bonds nor did they require voter approval for the city to levy the city-wide ad valorem tax.

James Spradlin, a resident taxpayer of the City of Fulton, filed suit claiming, among other things, that a golf course is not a "neighborhood" under the constitution or the Act and that issuance of the bonds without voter approval violates article VI, section 26, and article X, section 22(a) of the Missouri Constitution. The trial court found that the proposed golf course was a "neighborhood" under article III, section 38(c). However, the trial court held that issuance of the bonds without prior voter approval violated article X, section 22(a), and enjoined the City from issuing the bonds until it received the requisite voter approval. Both parties appealed.

## II.

### A.

■ We consider Spradlin's appeal first. He argues that the trial court erred in finding that the proposed golf course qualifies as a neighborhood improvement district.

Spradlin's attack is two-pronged. First, he contends that because section 38(c).2 refers to "electors" and "owners of record" that a neighborhood improvement district requires multiple owners. Without multiple owners, Spradlin contends, there is no "neighborhood;" hence, he claims no neighborhood improvement district can exist.

■ This argument ignores the rule that "[w]henever, in any statute, words importing the plural number are used in describing or referring to any matter, parties or persons, any single matter, party or person is included...." § 1.030, RSMo 1994. Rules for the interpretation of statutes apply with equal force to the constitution. *Rathjen v. Reorga-*

*nized School Dist. R–11*, 284 S.W.2d 516, 523 (Mo. banc 1955). We, therefore, hold that a constitutional provision referring to electors or owners also refers to an elector and a single owner.

Second, Spradlin contends that the word "neighborhood" inherently requires multiple parcels or multiple residents. Stated another way, Spradlin contends there can be no neighborhood without neighbors.

■ Absent constitutional definition, the meaning of words used in the constitution is the meaning understood by the voters who approve the constitutional provision. *Boone County Court v. State*, 631 S.W.2d 321, 324 (Mo. banc 1982). That common meaning is found in the dictionary. *Id.*

As Spradlin argues, it is true that one of the common definitions of "neighborhood" means "a number of persons living near one another or in a particular locality." Webster's New Universal Unabridged Dictionary 957 (1994). But dictionaries generally contain more than one definition of a word because words often have more than one meaning.

"Neighborhood" is a word that has multiple meanings. Webster's Third New International Dictionary 1514 (1976) includes within its definitions of "neighborhood," "an area or region of usu[ally] vague limits that is usu[ally] marked by some fairly distinctive feature of the inhabitants or terrain...." Webster's New Universal Unabridged Dictionary 957 (1994) also defines a "neighborhood" as "a district or locality, often with reference with its character or inhabitants." Under these commonly understood definitions, a neighborhood exists wherever there is a defined area, whether or not that area has multiple residents or residences.

■ If we were required to presume that acts of the legislature are unconstitutional, we could rely on the definition Spradlin offers to conclude that the constitution's use of "neighborhood" requires multiple parcels and multiple owners and that the legislature violated the constitution by adopting the definition it did. But the legislature's acts are presumed constitutional. *Hammer-*

*schmidt v. Boone County*, 877 S.W.2d 98, 102 (Mo. banc 1994). When a constitutional and an unconstitutional reading of a statute are equally possible, this Court must choose the constitutional one. *City of Jefferson v. Department of Natural Resources*, 863 S.W.2d 844, 848 (Mo. banc 1993). These rules properly serve to channel the exercise of the court's discretion and encourage the judicial branch to avoid the temptation to substitute its preferred policies for those adopted by the elected representatives of the people.

█ Thus, we conclude that the constitution does not require either multiple parcels or multiple residents before a neighborhood improvement district can exist. The definition of neighborhood improvement district adopted by the legislature in section 67.453(6) is consistent with one of the commonly understood meanings of "neighborhood" as set out in the dictionary and, therefore, is consistent with the Missouri constitution.

The legislature's definition of "neighborhood improvement district" has the virtue of furthering the purpose of the constitutional amendments that provide financing for improvements in particular areas of cities and direct that these improvements be paid for by those benefitting from them. Under Spradlin's formulation, if a single developer acquired this same 187.87 acres and persuaded the city to form a neighborhood improvement district for the purpose of providing streets, sewers and street lights for picket-fenced houses not yet built, the proposed development would not be a "neighborhood" and could not be the basis for a "neighborhood improvement district." The opposite is true as well. If two or three occupied mobile homes were included in the golf course property approved by the city in this case for a neighborhood improvement district, there would be an existing neighborhood and, under Spradlin's definition, the golf course together with the mobile homes would qualify as a neighborhood improvement district.

The legislature's definition also permits the elected officials of the city to choose whether a proposed neighborhood improvement district meets the city's future as well as present needs. If the voters disagree, they may express their disagreement at the ballot box during the next election.

We hold that the city's decision to create a neighborhood improvement district out of a single tract of land owned by a single entity is consistent with the Act and section 38(c). That some (and perhaps all) of the members of this Court might have chosen differently if performing a legislative function means nothing. Out of proper respect for the role of co-equal branches of government, this Court has consistently refused to second-guess local government legislative factual determinations that a statutory condition is met unless there is a claim that the city's decision is the product of fraud, collusion, or bad faith or is arbitrary and without support in reason or law. From among a legion of cases so holding, *see Allright Missouri, Inc. v. Civic Plaza Redevelopment Corp.*, 538 S.W.2d 320, 324 (Mo. banc 1976) ("[J]udicial review is limited to whether the legislative determination was arbitrary, there being no contention that such determination was induced by fraud, collusion or bad faith...."); *Parking Systems, Inc. v. Kansas City Downtown Redevelopment Corp.*, 518 S.W.2d 11, 16 (Mo.1974) ("Unless it should appear that the conclusion of the City's legislative body in the respect in issue ... is clearly arbitrary ..., we cannot substitute our opinion for that of the City's.... If the City's action ... is reasonably doubtful or even fairly debatable we cannot substitute our opinion for that of the City Council.") *Accord Tierney v. Planned Industrial Expansion Authority of Kansas City*, 742 S.W.2d 146, 150 (Mo. banc 1987); *Crestwood Commons Redevelopment Corp. v. 66 Drive-In, Inc.*, 812 S.W.2d 903, 910 (Mo. App.1991); *Schweig v. Maryland Plaza Redevelopment Corp.*, 676 S.W.2d 249, 252 (Mo. App.1984); *Maryland Plaza Redevelopment Corp. v. Greenberg*, 594 S.W.2d 284, 287 (Mo. App.1979). Spradlin's pleadings do not claim that the city's decision resulted from fraud, bad faith or collusion. The city's decision is not arbitrary. It finds support in both law and reason.

The point is denied.

## B.

The city appeals the trial court's judgment that article X, section 22(a), requires voter

approval before the city can issue its general obligation bonds. The city argues that article III, section 38(c), is a later-passed amendment to the constitution, that section 38(c) does not require voter approval by its own terms, and therefore, no voter approval of the bonds is required. Spradlin contends that article X, section 22(a), requires voter approval whenever a local government wishes to raise taxes, the later-in-time passage of article III, section 38(c), notwithstanding.

In a related point, Spradlin urges that Ordinance 692–95 offends section 38(c) because it purports to levy a tax against all of the taxable tangible property of the city in the event that the special assessment is insufficient to pay the principal and interest on the bonds. Spradlin's argument relies on his interpretation of the language of section 38(c).2 that permits a city to issue general obligation bonds but states that the "cost of *all indebtedness* so incurred *shall be levied and assessed* by the governing body of the city ... *on the property benefitted by such improvements.*" (Emphasis added.) In addition, Spradlin notes that section 38(c).1 directs that the city "shall" use the special assessments "to reimburse the city ... for the amount paid by it on the general obligation bonds issued...."

In response, the city argues that the constitution's use of the words "general obligation bonds" in section 38(c) must be read as an authorization in the city to levy a tax against all of the taxable tangible property in the city. The city's argument relies on article VI, section 26(f) ("section 26(f)"), for this conclusion.

## C.

■ Section 26(f) provides: "Before incurring any indebtedness every ... city ... shall provide for collection of an annual tax on all taxable tangible property therein sufficient to pay the interest and principal of the indebtedness as they fall due...." Section 26(f) applies only to general obligation bonds. *Wunderlich v. City of St. Louis*, 511 S.W.2d 753, 757 (Mo. banc 1974). Neighborhood improvement district bonds are general obligation bonds. §§ 38(c).1 & .2.

The parties agree that general obligation bonds are bonds that are "general obligations of the governmental body issuing them." *Drey v. McNary*, 529 S.W.2d 403, 408–09 (Mo. banc 1975). Such bonds "place the general credit of the sovereign behind them." *Drey*, 529 S.W.2d at 408. They are payable "by utilization of the full taxing power of the issuing entity." *Wunderlich*, 511 S.W.2d at 755.

By its language, section 26(f) requires that a city dedicate either an existing or new tax levied against *all taxable tangible property* in the city to meet the debt service whenever it issues general obligation bonds. Section 38(c) requires that "[t]he cost of *all* indebtedness so incurred shall be levied and assessed ... on the property benefitted by such improvements...." § 38(c).1. (Emphasis added.) The special assessment levied and assessed must "reimburse the city ... for the amount paid or to be paid by it on the general obligation bonds issued for such improvements." *Id.* Section 38(c) contemplates that the city will act as guarantor of the neighborhood improvement district bonds. It does so by issuing general obligation bonds that pledge the city's full faith and credit to the repayment of the bonds. In agreeing to issue neighborhood improvement district bonds, the city anticipates and agrees that in the event that special assessments against the district property produce insufficient income to reimburse the city's payments on the bonds, the city will make the payments out of its current income stream and surplus or by rearranging its priorities to reduce or eliminate discretionary municipal programs. Section 38(c) does not, however, authorize the city to impose a citywide tax on all taxable tangible property to pay for neighborhood improvement district bonds.

■ Section 38(c) and section 26(f) are at loggerheads. Where an irreconcilable conflict exists between constitutional sections, the section passed last in time prevails. *Ederer v. Dalton*, 618 S.W.2d 644, 646 (Mo. banc 1981). We hold that section 38(c) creates an exception to section 26(f) and does not permit the city to impose a city-wide tax on all

taxable tangible property when the city issues neighborhood improvement district bonds.

■ We turn now to consider Spradlin's claim that article X, section 22(a) ("section 22(a)"), requires voter approval before the city may levy a tax against all of the taxable tangible property in the city.

The city argues that section 38(c) overrules the requirements of section 22(a). The city's argument assumes that section 26(f) requires the city-wide tax and that section 38(c) dispenses with the need for voter approval of the tax. For the reasons previously expressed, however, section 38(c) does not authorize a city-wide tax for neighborhood improvements district bonds; sections 38(c) and 26(f) are in conflict, and section 38(c) prevails.

If a city chooses to impose a levy against all of the taxable tangible property in the city as a first resort upon failure of the special assessment against the property in a neighborhood improvement district to meet the bond payments, the bonds are no longer neighborhood improvement district bonds issued pursuant to section 38(c). They are simply general obligation bonds issued under the authority of section 26. We need not decide, therefore, whether section 22(a) applies. Section 26(b) requires the voters of the city to approve the issuance of general obligation bonds that require a city-wide tax to meet the debt service before the city can collect it.

This reading of section 38(c) is consistent with section 26(b). This is because section 38(c) requires that the owner(s) of property or electors who will pay the special assessment to retire the neighborhood improvement district bonds approve the formation of the district

> by the vote of a percentage of electors voting thereon within such district, or by a petition signed by the owners of record of a percentage of real property located within such district, that is equal to the percentage of voter approval required for the issuance of general obligation bonds under article VI, section 26[b].

§ 38(c).2. This petition process or limited vote assures that those who will be subject to the neighborhood improvement district special assessments participate in a process that approves the special assessment before they are levied at the same approval level ordinarily required for issuance of general obligation bonds. As authority cited by the city in its brief notes:

> The principal advantage to this process is that neighborhood improvement districts will offer property owners an opportunity to accomplish a needed improvement in their neighborhood or vicinity *without having the entire city voting on the issue or paying taxes to support it.*

(Emphasis added.) Jerry T. Powell, *Proposed Constitutional Amendment—Neighborhood Improvement Districts,* MO.MUN. REV., 4–5 (July 1990).

To summarize, section 38(c) permits the city to issue its neighborhood improvement district bonds without city-wide voter approval, but only to the extent that the city is willing to pledge its current revenue stream or surplus to the bond payments if the special assessments prove inadequate. The city must still pledge its full faith and credit as payment of the bonds even though no new city-wide tax supports the city's pledge. Whether potential bond holders will be willing to purchase the bonds on this basis is a decision left to the marketplace. The constitution is neutral on that question.

■ We declare that the portion of Ordinance 692–95 that purports to levy a new city-wide tax if the special assessment against neighborhood improvement district property proves inadequate without voter approval violates article III, section 38(c) and article VI, section 26(b).

The trial court held that article X, section 22(a), required voter approval before the city could issue the neighborhood improvement district bonds at all and based its injunction on that legal conclusion. For the reasons expressed, that broad holding is incorrect. On this record, however, we cannot know whether that portion of Ordinance 692–95 granting the city authority to levy the city-wide tax is severable from the remainder of the ordinance. Therefore, we must remand

the case to the trial court for a determination of the question whether the city-wide tax portion of Ordinance 692–95 is severable from the remainder of the ordinance.

### D.

 Finally, Spradlin claims that Fulton's ordinance violates the municipal debt limitations found in article VI, section 26 of the Missouri Constitution. As we understand his argument, he refers specifically to sections 26(a), 26(c) and 26(d). (Section 26(e) applies only to bonds issued to finance the construction or acquisition of utilities. We have previously considered arguments relating to sections 26(b) and 26(f).)

The city argues that section 38(c).3 establishes an independent debt limitation in the city. "The total amount of city ... indebtedness for all such districts shall not exceed ten percent of the assessed valuation of all taxable tangible property...." *Id.*

We need not consider whether section 38(c) provides the city an additional ten percent debt limitation above that provided in section 26 or whether the debt limitations imposed in section 26 are the total, cumulative limits for municipal debt including section 38(c) debt. Spradlin's petition does not plead, nor did he offer evidence to support a conclusion, that the bonded indebtedness assumed by the city in this case exceeds either reading of the constitution's limitations. The issue is, therefore, not properly before the Court and the point is denied

### III.

The judgment of the trial court is affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.

BENTON, LIMBAUGH and COVINGTON, JJ., concur.

PRICE, J., dissents in separate opinion filed.

HOLSTEIN, C.J., and WHITE, J., concur in opinion of PRICE, J.

PRICE, Judge, dissenting.

I respectfully dissent from the majority opinion. I would hold that article III, § 38(c) of the Missouri Constitution and the Neighborhood Improvement District Act ("Act") require the *improvement* of a *neighborhood* to justify public indebtedness thereunder. Unfortunately, the majority reads the most important word, "neighborhood", out of the amendment and the Act.

In 1990 a constitutional amendment was submitted to the voters of Missouri. The amendment authorized public indebtedness to fund "neighborhood improvement districts". As was stated in an article prior to the adoption of the amendment, "One of the most serious problems confronting cities and counties in Missouri is the financing of local improvements such as streets, curbs, sidewalks and sewers that benefit a relatively small area and should be paid for by the property benefited and not by the taxpayers at large." Jerry T. Powell, *Proposed Constitutional Amendment—Neighborhood Improvement Districts*, Missouri Municipal Review, July 1990 at 4, 4.

Although the term "neighborhood improvement district" appears in the title and twice thereafter in the text of article III, § 38(c), it is not defined in the amendment. In construing the constitution, we are obliged to interpret the words used as the average voter would on election day. *Zahner v. City of Perryville*, 813 S.W.2d 855, 858 (Mo. banc 1991); *Keller v. Marion County Ambulance Dist.*, 820 S.W.2d 301, 302 (Mo. banc 1991). There is no doubt that the average voter is familiar with and understands the terms "neighborhood" and "improvement."

A neighborhood is commonly understood as an area where people live or work, that has a character separating it from other areas. This is certainly how dictionaries define the word. *Webster's Third New International Dictionary* 1514 (1981) defines "neighborhood" as:

1: friendly association with another that is a neighbor: the agreeable easy relationship usual among congenial neighbors ... 2: the quality or state of being immediately adjacent or relatively near to something: PROXIMITY ... 3a: the approximate

area or point of the location or position of something ... b: the approximate amount or extent or degree—usu[ally] used with *in* and a qualifying phrase ... 4a: a number of people forming a loosely cohesive community within a larger unit (as a city, town) and living close or fairly close together in more or less familiar association with each other within a relatively small section or district of usu[ally] somewhat indefinite boundaries and usu[ally] having some common or fairly common identifying feature (as approximate equality of economic condition, similar social status, similar national origins or religion, similar interests) and usu[ally] some degree of self-sufficiency as a group (as through local schools, churches, libraries, business establishments, cultural and recreational facilities) ... b: the particular section or district that is lived in by these people and that is marked by individual features (as type of homes and public establishments) that together establish a distinctive appearance and atmosphere ... c: an area or region of usu[ally] vague limits that is usu[ally] marked by some fairly distinctive feature of the inhabitants or terrain ...

Other definitions of "neighborhood" include the following:

1. Neighbourly feeling or conduct. 2. Nearness, vicinity *of* ... 3. Neighbours, people of a district; district, esp[ecially] one forming a community within a town or city. *The Concise Oxford Dictionary* 730 (6th ed. 1976).

neighborhood, noun
area and the people who live in it; this is a quiet neighborhood; the mailman knows everyone in the neighborhood.
*Beginner's Dictionary of American English Usage* 152 (1986).

1. A district considered in regard to its inhabitants or distinctive characteristics: *a fashionable neighborhood.* 2. The people who live in a particular vicinity: *The noise disturbed the entire neighborhood.* 3. *Informal.* Approximate amount or range:

*in the neighborhood of ten million dollars.* The American Heritage Dictionary of the English Language 879–880 (1978).

*See also Webster's New Universal Unabridged Dictionary* 957 (1994); *The American Heritage Dictionary* 836 (2d college ed. 1991); *Webster's Ninth New Collegiate Dictionary* 792 (1983); *The Random House Dictionary of the English Language* 957 (1967).

The above definitions use the terms "inhabitants", "people of a district", or "people forming a loosely cohesive community", all indicating the need for people to comprise a neighborhood. In fact, how can there be a neighborhood without neighbors, "one whose house or other place of residence immediately adjoins or is relatively near that of another." *Webster's Third New International Dictionary* 1514 (1981). Certainly the ballot title for this constitutional amendment indicated that "residents" would be included in any neighborhood improvement district that would be formed:

Authorizes legislature to enact legislation to establish neighborhood improvement districts whereby **residents** of the district may, by vote, incur indebtedness to pay for public improvements therein. Vote requirements are specified, and allowable indebtedness is limited. Enabling legislation and voter approval would be required before this amendment could have any fiscal impact. 1990 *Mo.Laws* 1167 (emphasis added).[1]

We do not need to explore the concept of a "neighborhood" in any more detail to know that the area to be benefited from the proposed bonds in this case is obviously not a "neighborhood" in the ordinary sense that the word is used. Nor would any passerby use "neighborhood" to describe the property. The 187.87 acre district was a farm, previously not even within the city limits. Callaway County Golf Partners ("CCGP"), a private development entity, purchased approximately 268 acres of land outside the city limits which was annexed by the city. CCGP then peti-

1. Voters who read the ballot title and voted for the amendment would be amused to learn that a single family dwelling or a vacant lot could be declared a "neighborhood." Moreover, those voters would be shocked to learn that a single family dwelling "neighborhood" could be "improved" by being bulldozed to the ground in favor of some totally different use. Nevertheless, that is what the principal opinion suggests was intended.

tioned the city to create a neighborhood improvement district with 187.87 of those acres to create a golf course. As far as the record reveals, no one currently resides on this acreage. People do not live or work there as a community. Even when it is developed it will only be a golf course. Although the developer plans to build 117 homes near the golf course, the district does not include the land upon which the residences are to be constructed.[2] While as a golf course the property might benefit the nearby proposed neighborhood, it is not a neighborhood in and of itself.

The need for an existing neighborhood is reinforced by the use of the word "improvement" in article III, section 38(c). Improvement means "enhanced value or excellence", "betterment", or "a permanent addition to or betterment of real property." *Webster's Third New International Dictionary* 1138 (1981); *see also § 67.453(4), (5), RSMo 1994.* The idea of improvement contains within it a temporal sense of a condition before and a condition after. Something must exist in a prior condition before it can be improved. While it is contemplated that a farm will be *transformed* and a new golf course *created*, no specific area of the city that could have been considered theretofore as a neighborhood is being bettered, added to, enhanced, or *improved*. "Improvement" as used in article III, section 38(c), immediately follows the word "neighborhood". There must first be a neighborhood before the neighborhood can be improved.

The majority attempts to finesse the absence of a neighborhood by relying upon the admittedly vague definition of "neighborhood improvement district" supplied in the Neighborhood Improvement District Act, which reads:

> (6) *"Neighborhood improvement district "*, an area of a city or county with defined limits and boundaries which is created by vote or by petition under sections 67.453 to 67.475 and which is benefited by an improvement and subject to special assessments against the real property therein for the cost of the improvement. *§ 67.453(6)*

Because the legislature's definitional language does not include a requirement of anything other than "an area of a city or county within defined limits and boundaries . . . which is benefitted by an improvement", the majority does not believe any of the other characteristics normally associated with the word "neighborhood" are necessary. The majority relies upon the traditional arguments that statutes are presumed constitutional and that a constitutional rather than an unconstitutional reading of a statute must be adopted to support its position.

While both of these principles are valid, they simply do not apply here. In fact, the majority stands the law on its head by reading a clear and direct constitutional provision to conform to a vague and indefinite statute. Instead, the law requires that the statute must be read to conform to the constitution. *Beatty v. State Tax Com'n*, 912 S.W.2d 492, 495 (Mo. banc 1995); *Bennett v. Owens–Corning Fiberglas Corp.*, 896 S.W.2d 464, 467 (Mo. banc 1995). "Where possible, courts are to interpret statutes so that they are in harmony with the constitution." *Bennett*, 896 S.W.2d at 467. In short, the majority reads the definitional language of § 67.453(6) in such a way that renders the word "neighborhood" in article III, section 38(c) of the constitution meaningless. This is improper under any principle of constitutional law as statutory construction.

The legislature cannot define a "neighborhood improvement district" without giving effect to the words "neighborhood" and "improvement." To read § 67.453(6) consistent with its constitutional authorization, we must require that a "neighborhood improvement district" be any "area of a city or county" that actually comprises a neighborhood. While the statutory definition may allow the local government great flexibility in defining the boundaries of a neighborhood, a neighborhood, nonetheless, must exist to be enhanced or improved. School districts must have schools. Neighborhood improvement districts must have neighborhoods. Had the drafters of the amendment intended otherwise, different language should have been

---

**2.** The record does not establish why the private developers do not bear the cost of the course.

submitted to the voters, without the key word "neighborhood." [3] The "area" now designated as a neighborhood improvement district is not, nor will it ever be, a neighborhood as the term is commonly used and as the voters would have understood it in 1990.

While the majority attempts to resolve the broader issue of when an election is required in connection with tax levies and neighborhood improvement bonds, we are not allowed to favor one constitutional requirement over another. The constitutional requirement that a neighborhood be improved as a condition to the issuance of a neighborhood improvement district bond should not be sacrificed to that end. The actual neighborhoods of our state, particularly in our larger urban areas, cannot afford to have this new funding resource diverted to newly created centerpieces of private residential developments.[4]

For this reason, I would affirm the judgment of the trial court and enjoin the city from issuing these bonds.

**3.** For example, the New York legislature has enacted a similar provision creating "business improvement districts." *N.Y. General Municipal Law § 980–980p (McKinney Supp.1996).* The terms "special improvement district", "special benefit district" or "local improvement district" are also commonly used. *Colo.Rev.Stat. § 31–25–501 to 541 (1986 & Supp.1995)* (Part 5 is entitled "Special Improvement Districts in Municipalities"); R.B. Fickel, II, *Management and Mismanagement of Municipal Special Improvement Districts,* 22 Colorado Lawyer 2263 (1993); Jerry T. Powell, *Proposed Constitutional Amendment—Neighborhood Improvement Districts,* Missouri Municipal Review, July 1990, at 4, 5.

**4.** Of course, an existing neighborhood could use the Neighborhood Improvement District Act to fund the acquisition of a golf course if the neighborhood so voted or the city could vote to fund such a project by general obligation bonds. Interestingly, the voters of Fulton rejected the creation of this golf course in 1993 when presented to them in the form of a general obligation bond.